In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00084-CV**
_____

**IN THE INTEREST OF M.H. AND Z.H.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-219,416**

**MEMORANDUM OPINION**

After a bench trial, the trial court entered an order that terminated the parental rights of U.H. (Mother) as to her two minor children, M.H. (a five-year-old girl) and Z.H. (a nineteen-month-old boy).[1] In the same order, the trial court also terminated the parental rights of the fathers of the children. Mother appeals the termination, raising four issues.[2] We affirm.

---

[1]We identify the minor children and Mother by initials. *See* Tex. R. App. P. 9.8.

[2]No appeal was filed on behalf of the fathers. Therefore, we discuss the facts as to the fathers only where necessary to our review regarding Mother.

At the time of trial, Mother was twenty-six years old and not married. The State was unable to locate the man thought to be M.H.'s father, and Z.H.'s father is unknown. The evidence presented at trial established that Mother has a history of mental health problems, including incidents of self-harm or attempted suicide.

M.H. was born in February of 2009, and she was five years old at the time of trial. M.H. was born premature, but the record does not reflect that M.H. has had any significant medical or developmental issues. Z.H. was born in June of 2013, and he was about nineteen months old at the time of trial. Z.H. was born several months premature, and the record establishes that he has developmental delays as well as brain damage. An MRI revealed that Z.H. suffered a stroke at birth. He has other health related problems regarding eating, eyesight, movement, and urology.

INITIAL REMOVAL AND PETITION FOR CONSERVATORSHIP AND TERMINATION

In October of 2013, the Texas Department of Family and Protective Services (the Department) filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship supported by an Affidavit for Emergency Removal dated October 11, 2013, pertaining to both M.H. and Z.H. The affidavit stated that the Department had received two reports alleging neglectful supervision of Z.H. by Mother, that

2

Mother did not have enough formula for Z.H., that Mother had missed two of Z.H.'s doctor's appointments and had not rescheduled them, that Z.H. had been admitted to a medical center for a breathing difficulty due to Mother feeding him improperly, and that Mother was co-sleeping with Z.H. The affidavit stated that Z.H. is a special needs child because he was born premature, that he "is medically fragile and in need of structured care[,]" and that "[h]ospital staff feels [Mother] cannot properly meet his needs at this time."

The affidavit also stated that Mother "refuses to take her mental health medications[,]" admitted to having suicidal ideations, and was in an abusive relationship with Z.H.'s father. It further alleged that M.H. was not in Mother's care because Mother had given M.H. to the child's godmother and further that Mother is unable to care for M.H. due to Mother's "mental state."

On October 24, 2013, the trial court entered a Temporary Order Following an Adversary Hearing, wherein the trial court included certain findings and a notice to Mother as follows:

> The Court finds and hereby notifies the parents that each of the actions required of them below are necessary to obtain the return of the subject child(ren), and failure to fully comply with these orders may result in the restriction or termination of parental rights.

3

The Department formulated a Family Service Plan for Mother. Thereafter, on December 5, 2013, the trial court issued a Status Hearing Order, requiring Mother to comply with the terms of her service plan and setting a date for the final hearing. On October 30, 2014, a Permanency Hearing Order was entered by the trial court following a permanency hearing, and setting the final hearing. A bench trial was held on February 12, 2015.

TESTIMONY OF CASEWORKER ASSIGNED AFTER REMOVAL

Eva Blanchard (Blanchard), the Child Protective Services (CPS) caseworker in charge of the case, testified at trial. According to Blanchard, at the time of the hearing, M.H. was in a fictive relative home and Z.H. was in a foster home. Blanchard explained that, before the case began, M.H. was placed with Ms. G, a fictive relative, because Mother was having trouble taking care of M.H., Mother's mother was very sick, and Mother asked Ms. G to help take care of M.H. Blanchard testified that Mother told her that it is sometimes difficult for Mother to take care of M.H. because Mother has a seizure disorder and is prone to depression.

Blanchard testified that Z.H. was born twenty-five weeks premature, with brain damage and parts of his body not properly developed, and he required surgery for a urological issue. Z.H. is "a difficult feeder" and is delayed in his

speech and movement. Blanchard explained that Z.H. has "multiple doctors" at Texas Children's Hospital in Houston and "multiple therapy appointments."

Blanchard explained to the court that early in the case CPS suspected that Mother was not feeding Z.H. properly, and at one point, Z.H. was taken to the hospital because "he had stopped breathing due to being laid on his back at feeding." Blanchard also testified that CPS had gotten a report that Mother had missed a doctor's appointment for Z.H. CPS determined that Mother was co-sleeping with Z.H., and Z.H. was not sleeping in the playpen that CPS had given to Mother. Blanchard testified that Mother had not done anything throughout the case to educate herself on how to take care of Z.H.'s needs, and Blanchard did not believe Mother would be able to keep up with all of Z.H.'s appointments.

Blanchard further explained that she had concerns about Mother's mental health and did not think Mother had understood the information CPS was giving her. Blanchard testified that Mother has a seizure disorder, and Mother did not seem to understand the connection between taking care of herself and taking care of her children. Blanchard was also concerned because Mother had three suicide attempts, one of which occurred when Mother was pregnant with Z.H., and Mother's first suicide attempt included cutting her wrists. According to Blanchard:

[Mother's] functioning with the children is she's high risk. She doesn't understand how to speak to them and that they are not adults. She will put them in risky situations. It's what the psychological states that she's a high risk parent, that she would do things that would be risky for her children.

Blanchard testified that she felt that Mother knowingly placed or knowingly allowed Z.H. to remain in a condition where his physical or emotional well-being was in danger, but Mother had not done so with M.H. because M.H. was with other caregivers.

Blanchard stated that, early in the case, Mother "bounced" from home to home and stayed with various people, but at the time of the trial, Mother had found an apartment. Blanchard testified that there had been several police reports regarding domestic violence when Mother was living with D.S., the man first thought to be Z.H.'s father. Blanchard stated Mother never reported that D.S. had physically injured her, but Mother was afraid of him, and Mother told Blanchard that D.S. "would come at her and try and hit her and she would have to defend herself."

Blanchard testified that Mother had maintained contact with Blanchard throughout the case, had completed parenting classes, had undergone a psychological examination, had attended all family visits, had complied with all drug tests, and had never tested positive on any of the drug tests. However,

Blanchard explained that Mother did not complete all of the required counseling sessions. Blanchard also noted that Mother had not brought Mother's medications to the CPS office as requested, so Blanchard was not able to count the medication to verify whether Mother was taking all required medications.

CPS had asked Mother for names of relatives who could help her with the children so she would not lose conservatorship, but Blanchard agreed that the people Mother suggested were "obviously not appropriate or able to take care of children[.]" Blanchard explained that termination was a better option than transferring conservatorship because "[w]e don't have family to transfer conservatorship to." Blanchard further testified that M.H. had been with her godparent, Ms. G, since February of 2013, and further that Ms. G was interested in adopting M.H. Blanchard also testified that Z.H.'s foster parents had made sure he made it to all of his appointments and therapy. According to Blanchard, Z.H.'s foster parents want to adopt Z.H.

The report from the Court Appointed Special Advocate (CASA) was admitted into evidence during the trial. According to the CASA advocate's report, the CASA recommended termination of all parental rights as being in the best interest of the children. The CASA reported that Mother had been diagnosed with bi-polar and seizure disorders and that Mother had reported having suicidal

thoughts. According to the CASA report, when the CASA visited Mother's two bedroom apartment, it was "neatly kept," with two small beds in one bedroom. The CASA noted that Dr. Coxe had examined Mother and recommended that Mother "undergo a thorough psychiatric examination" and that "[Mother] is clearly a high risk parent." The CASA advocate also noted that on December 2, 2014, Mother advised the CASA that she had recently obtained seizure medication; however, the CASA was unable to verify the information, and "[Mother] did not follow the recommendation of Dr. Coxe to seek a psychiatric evaluation." On December 9, 2014, the CASA and a CPS caseworker attempted to complete an unannounced home visit. Neighbors reported that Mother was on the property at the apartment complex, but after visiting four different apartments, CASA was unable to locate Mother. CASA and the CPS worker were able to verify that Mother's paramour, D.S., lives in the same complex and has his own apartment. Later, CASA attempted another unannounced home visit in order to determine if in fact Mother was taking her seizure medications, if her medications had changed, and the name of the doctor that prescribed the medications. Prior attempts to verify Mother's physician were not possible as the CASA determined that the name of the physician provided by Mother did not exist in the state of Texas. Mother was not at home at the time of the visit, so CASA attempted to locate Mother at D.S.'s

8

apartment. D.S. did not initially answer the door. Later, D.S. told CASA in the parking lot that he and Mother were no longer together but he would contact Mother and let her know the CASA had been there. On the way back to the office, Mother called the CASA via a cell phone and advised she was working. Mother also told the CASA she was still engaged to D.S., the opposite of the information D.S. had provided to the CASA.

MENTAL HEALTH AND THERAPY RECORDS

Medical records affidavits and documents relating to Mother were admitted into evidence, including records from Ray Coxe, PhD, and Georgia (Ann) Williams, Med LPC. Mother's attorney also introduced a letter from Sean E. Franklin, D. Min., LPC.

Dr. Coxe's evaluation was dated January 15, 2014, and reported that Mother takes medication for grand mal seizures and her most recent seizure was during her last pregnancy. Coxe noted that Mother had been diagnosed with "Bipolar Disorder" in the past. According to Dr. Coxe:

> She has had several incidents of self-harm including slitting her wrists, taking pills, and putting a radio in the bath tub. Her first incident was when she was fifteen, the second time when she was pregnant with her son and admitted herself into a hospital. Her most recent attempt was in March 2013. She reports that she experience[d] postpartum depression following the births of her children.

Coxe stated in his report that Mother's responses to the Rorschach Inkblot Measure showed "significant psychological disturbance involving thinking, depression, and anxiety, as well as a risk of self-harm," "poor reality testing," and "somewhat distorted thinking[.]" Coxe recommended she undergo a thorough psychiatric examination, parenting classes, and counseling, and he concluded "[t]his is clearly a high risk parent whose resources to effectively manage a special needs child are very limited." The evaluation report also noted that Mother had given up her apartment to care for her mother, who has since died, and Mother was living with her sister, and waiting for financial aid to get an apartment.

According to the therapy records from Ann Williams, Mother attended only six of the approved twelve therapy sessions. In the therapy, the goals were to address issues of domestic violence, self-esteem, parenting, and symptoms of bipolar disorder. In one of the sessions that occurred on January 22, 2014, Mother reported to Williams that Mother "allowed her son to sleep on her chest, expressing the hospital spoiled him by holding him too long." During another therapy session, Mother reported to Williams that she was no longer in a relationship with Z.H.'s father, and they discussed her "pattern of selecting boyfriends." In the therapy progress reports, Williams noted that Mother had ongoing problems with the man first thought to be Z.H.'s father, including being

10

fearful of him and having a restraining order against him. Williams' final report states "[t]herapist has not heard from [Mother] since 4-23-14 when she called to cancel her appointment. Therapist would not recommend placement of the children back into the home due to [Mother] repeatedly placing herself in harmful situations."

TESTIMONY OF MOTHER

Mother testified that she has had mental health problems and thoughts of suicide since she was fifteen years old. She testified that the reason why she had mental health problems was that she had been raped by her father. Mother agreed that she had one suicide attempt when she had possession of the children, and she described that suicide attempt as an incident where she "took a whole bunch of vitamins." She also said she committed herself to the hospital in 2012, because she had thoughts of suicide, but she denied she was pregnant at that time. Mother agreed she had a suicide attempt while she was pregnant with Z.H., but she testified that she stopped herself and called an ambulance. Mother stated she had applied for Social Security disability benefits based on her "seizures, the bipolar ness [sic], the thoughts of suicide, the anxiety, basically all my emotional and mental problems." She also testified that she had been prescribed Trazodone, Seroquel, and Depakote.

11

According to Mother, she was diagnosed with "epilepsy hormone seizures." At trial, she stated that the last seizure she had was when she was pregnant with Z.H. Mother said that she does not feel that her seizures prevented her from caring for her children because she could tell when a seizure was coming on and she had people who check on her. She also described having "real bad headaches[,]" that would leave her feeling numb and cause her to black out, but she testified that she had not had such an episode since she was nineteen years old.

At trial, Mother testified she was living in an apartment with working utilities, and that she had lived at that location for almost two years. She explained that one time her lights "got turned off[,]" and she then went to stay with her mother, but she returned to her apartment when she got the money to "turn the lights on[.]" She denied living "in several different places[,]" but she also agreed that she had lived with her mother and her sister, and on nights when she attended parenting classes, she would stay with friends. Mother denied ever reporting any domestic abuse by D.S. and testified that she no longer was in a relationship with him. The State cross-examined Mother about certain photos from Mother's Facebook page indicating that a few days before the trial Mother continued to post photos of herself with D.S. on Mother's Facebook page.

Mother testified that M.H. went to live with Ms. G, "but not stay there[,]" and Mother explained that "I gave her [to Ms. G] because I couldn't provide what she needed. I could have provided food, but I couldn't provide for the bills." She explained that Ms. G helped her out with M.H. at a time when Mother was trying to find a job. Mother testified that she got food stamps, which she believed was sufficient to provide her children with food and clothing. In her testimony, Mother said she had a job ringing the bell for Salvation Army. In her intake form for counseling with Williams, she reported she worked for McDonald's as a cashier, but a later counseling report recited that Mother had quit her job with McDonald's. Mother also testified that she never had transportation and that she "barely had bus fare money." She said she missed one of Z.H.'s doctor's appointment "due to transportation[,]" and she missed another of his appointments because her mother forgot to remind her. She also testified that she missed one of her own appointments for medication because she didn't have transportation.

Mother also testified that she did not learn anything about Z.H.'s medical issues when he was in the hospital except about his eyesight and that the hospital did not inform her that Z.H. had any other problems. Thereafter, Mother explained that, when Z.H. was in the neonatal intensive care, "I get there after their rounds when I talk to [a nurse] and ask her how he's doing. Well, he's doing good, he's

13

fine, this and that. Only problem we had was him breathing on his own." She stated at trial that "I'm just finding out today what's going on with him." Mother admitted that Z.H. had slept in the bed with her, but Mother testified that she slept on the edge of the bed so that she would roll forward and not roll onto Z.H. According to Mother, the hospital had never given her instructions regarding Z.H.'s problems with reflux.

Mother felt like she had completed her service plan. Mother testified that she completed parenting classes, submitted to drug screens, and she had an apartment with working utilities where she had been living for about a year and a half. Mother admitted that she only went to six counseling sessions with Williams, but according to Mother, she stopped attending the sessions because "Eva Blanchard told [her] to stop going." Mother testified that after she missed a session with Williams, Mother called Williams but never got a response. Mother told the court that when she told Blanchard she could not make an appointment with Williams that Blanchard told Mother "don't worry about it. You don't have to go no more." Mother denied understanding that the counseling sessions were a significant part of her service plan and that missing six sessions meant that the State would proceed with termination. She agreed at trial that she had not received medications or therapy since her last contact with Williams in April 2014.

After the bench trial, the trial court signed a final order of termination on February 12, 2015, naming the Department as permanent managing conservator of the children, and terminating Mother's parental rights to both children. In addition to finding that termination of Mother's parental rights was in the children's best interest, the trial court found that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; and (3) failed to comply with the provisions of the court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West 2014).

## ISSUES ON APPEAL

In four appellate issues, Mother challenges the trial court's termination of her parental rights. Mother asserts that the evidence was legally and factually insufficient to support the trial court's findings that (1) termination was in the best interest of M.H. and Z.H.; (2) Mother knowingly placed or allowed M.H. and Z.H. to remain in conditions or surroundings that endangered their physical or emotional well-being; (3) Mother engaged in conduct or knowingly placed M.H. and Z.H.

15

with persons who engaged in conduct that endangered the children's physical or emotional well-being; and (4) Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children.

STANDARD OF REVIEW IN PARENT-CHILD TERMINATION CASES

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, parental rights can be terminated upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Family Code, and termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*,

96 S.W.3d at 266. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109.

### STATUTORY GROUNDS FOR TERMINATION

In her fourth issue, Mother challenges the sufficiency of the evidence that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who

17

have been in the temporary managing conservatorship of the Department for at least nine months as a result of the children's removal due to parental abuse or neglect. *See* Tex. Fam. Code Ann. § 161.001(1)(O). Courts have generally applied subsection (O) strictly. *See In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.). Subsection (O) makes no provision for excuses for a parent's failure to comply or for partial compliance with the court-ordered service plan. *See id.*; *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied).

In the Temporary Order Following Adversary Hearing signed on October 24, 2013, the trial court ordered Mother to "attend counseling sessions to address the specific issues that led to the removal of the child(ren) from the home" and "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." In the Status Hearing Order signed on December 5, 2013, the trial court made the service plan an order of the court. Blanchard testified that the service plan was created in late 2013. Mother admitted that she received the service plan October 2013. The service plan required Mother to obtain and maintain appropriate and safe housing for herself and her children, to maintain contact with the Department, to notify the Department of any changes in her contact information, to complete parenting classes, to attend individual counseling, to obtain a full psychological evaluation,

to cooperate with random drug screens, and to attend scheduled family visits or to notify the Department in advance if unable to attend. The service plan required Mother to attend therapy with Williams twice a month, and it expressly provided that "Williams will inform [Mother] when her counseling goals have been [successfully] completed."

Blanchard testified that Mother was compliant with her service plan as to housing, that she had maintained contact with Blanchard throughout the case, that Mother did not miss her visitation with the children, that Mother completed parenting classes, that Mother submitted to random drug tests, and that Mother had a psychological evaluation with Dr. Coxe. However, Blanchard was unable to verify whether Mother was taking the medications that Dr. Coxe recommended, and furthermore Mother failed to complete her counseling sessions. Blanchard further explained to the court that she told Mother she needed to complete counseling with Williams. Williams' Therapy Progress Reports regarding her counseling sessions with Mother were admitted into evidence. These reports show that Mother attended only six of the twelve approved sessions between January and April of 2014. Williams' report in July of 2014 stated that "[t]herapist has not heard from [Mother] since 4-23-14 when she called to cancel her appointment[]" and that six counseling units remained of the twelve that were authorized.

Mother testified that she felt as though she had completed her service plan because she completed parenting classes, complied with drug testing, and she believed she had stable housing. She testified that the reason she attended only six counseling sessions with Williams was that "Eva Blanchard told [her] to stop going." Mother also explained her failure to continue with Williams was that Mother never heard back from Williams after Mother called Williams after having missed a session.

In her appellate brief, Mother concedes that she was unable to complete all counseling sessions with Williams, but Mother contends that she was never told she needed to complete twelve sessions. Mother's court-ordered service plan required her to attend counseling sessions with Williams until Williams informed her that she had completed her goals. Blanchard's testimony, along with Williams' counseling reports, and the testimony from Mother establish that Mother failed to complete the counseling sessions.

Subsection 161.001(1)(O) "looks only for a parent's failure to comply with a court order, without reference to [the] quantity of failure or degree of compliance." *In re D.N.*, 405 S.W.3d at 877. The evidence was undisputed, as detailed above, that Mother failed to complete the services that were required by her family service plan and ordered by the trial court. While the mother made a number of excuses for

her failure to complete the services, section 161.001(1)(O) does not require the court to consider excuses for a parent's failure to comply with the court-ordered services. *See In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). Viewing the evidence in the light most favorable to the trial court's finding under subsection 161.001(1)(O), we conclude that the trial court reasonably could have formed a firm belief or conviction that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of M.H. and Z.H. *See* Tex. Fam. Code Ann. § 161.001(1)(O); *see also In re T.T.*, 228 S.W.3d 312, 319-21, 326 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (affirming termination where the mother failed to comply with some of the requirements of the plan); *In re C.D.B.*, 218 S.W.3d 308, 311-12 (Tex. App.—Dallas 2007, no pet.) (affirming termination based on the mother's partial compliance with service plan). Accordingly, we conclude that the trial court's finding with regard to subsection 161.001(1)(O) is supported by legally and factually sufficient evidence. We overrule Mother's fourth issue.

BEST INTERESTS OF THE CHILDREN

Mother's first issue challenges the sufficiency of the evidence supporting the finding that termination of Mother's parental rights is in the children's best interest. Mother argues that she loves her children, that there is no testimony

21

showing that she abused or neglected her children, and that she provided clothing and gifts to the children. She further argues that she "has had a rough life" and "needs more help to overcome her problems[.]" The State argues that the trial court could have concluded that Mother would be unable to meet her children's emotional and physical needs given Mother's history of mental health problems, suicide attempts, and reports of domestic violence. The State also argues that the evidence at trial showed that Mother has poor judgment regarding care for herself and for her children.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). The Texas Supreme Court has recognized a non-exhaustive list of factors that are pertinent to the inquiry of whether termination of parental rights is in the best interest of the child: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any

excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors"); *see also* Tex. Fam. Code Ann. § 263.307 (West 2014).

No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the child's best interest. *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). In examining the best interest of the child, we may consider evidence that was also probative of the predicate act or omission. *See In re C.H.*, 89 S.W.3d at 28. The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in M.H.'s and Z.H.'s best interest, then we must conclude that the evidence is legally insufficient. *See In re J.F.C.*, 96 S.W.3d at 266.

Mother admitted at trial that she has a history of seizures, suicidal thoughts and suicide attempts, and mental health problems. She has been diagnosed with bipolar disorder, and she has been on different medications. Mother's most recent seizure was when she was pregnant with Z.H.

The CPS caseworker testified that Mother had made reports of domestic violence against the man thought to be Z.H.'s father. Mother's therapist, Georgia (Ann) Williams, noted in her counseling reports that she would not recommend placing M.H. and Z.H. back with Mother due to Mother "repeatedly placing herself in harmful situations." Mother has lived with her mother, with her sister, and has stayed with friends, and admits that at least one time Mother was unable to pay her light bill. Mother also admits she lacks transportation, which she says has caused her to miss a doctor's appointment for Z.H. and prevented her from getting her own medication. Mother believes that food stamps will be adequate for her to provide food and clothing for her children as well as "anything else they may need[.]" She says her young daughter "is there to comfort [her]" when Mother has problems, and Dr. Coxe reported that Mother has "a tendency to treat [her] children as a confidant [sic] and peers[.]"

The evidence shows that Z.H. has serious medical issues due to having been born premature, including difficulty with feeding, a urological issue, and delays in speech and movement. An MRI revealed that he had a stroke at birth and that he had brain damage associated with memory problems. He has frequent appointments and takes multiple medications. The CPS caseworker testified that Mother had done nothing to educate herself on how to take care of Z.H., and

Mother testified at trial that she was just learning about Z.H.'s health problems during the trial. The psychological evaluation by Dr. Coxe stated that Mother's "resources to effectively manage a special needs child are very limited." Z.H. had been removed from Mother due to abuse or neglect, he had been in the care of the Department and foster parents for many months, and his foster parents wanted to adopt him.

M.H. was already living with Ms. G and not with Mother when CPS first received the report of medical neglect in October of 2013. Mother testified that she sought help with M.H. from Ms. G because Mother was trying to find a job. Although Mother denied giving M.H. to Ms. G, Mother stated that Ms. G "basically . . . helped for major stuff." Mother also testified that M.H. "went to go live there [with Ms. G] but not stay there. She went to go visit, like, every weekend; and then it came to days, then it came to, like, months, and then all this happened." Mother agreed that she gave M.H. to Ms. G because Mother could not provide what M.H. needed. The CPS caseworker testified that M.H. began living with Ms. G before the current case began, that M.H. was with Ms. G at the time of trial, and that Ms. G was interested in adopting M.H. Mother agreed that M.H. was doing well with Ms. G.

The trial court could have concluded from the evidence that Mother lacked the ability and resources to meet the emotional and physical needs of her children now and in the future and that her home lacked sufficient stability to care for her children. Mother also recognized her own inability to care for M.H. and voluntarily left M.H. with Ms. G prior to the birth of Z.H.[3] Z.H. was removed from Mother's care due to medical neglect. The trial court could have resolved any inconsistencies in the evidence by believing the testimony of the CPS caseworker and reports by CASA, Coxe, and Williams and disbelieving Mother's testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Considering the *Holley* factors against the evidence at trial, we conclude the trial court could reasonably have formed a firm belief or conviction that termination of Mother's parent-child relationship with M.H. and Z.H. is in the children's best interest and that the evidence to the contrary is not so significant that a factfinder could not reasonably form a firm belief or conviction that termination is in M.H.'s and Z.H.'s best interest. *See* Tex. Fam. Code Ann. § 263.307(b); *Holley*, 544 S.W.2d at 371-72.

---

[3]*See* Tex. Fam. Code Ann. § 161.001(1)(B) (a court may order termination of the parent-child relationship if clear and convincing evidence shows the parent voluntarily left the child in another's possession, the parent expressed no intent to return, the parent did not provide adequate support of the child, and the parent remained away for at least three months).

26

We conclude that the evidence at trial is legally and factually sufficient to support the trial court's finding. We overrule Mother's first issue.

Having determined that the evidence is legally and factually sufficient to support the trial court's finding that Mother failed to comply with the court-ordered plan and that the evidence is legally and factually sufficient to support the trial court's finding that termination is in the best interest of both children, we need not address Mother's second and third issues relating to the trial court's findings pertaining to other grounds for termination. *See* Tex. R. App. P. 47.1 (requiring the appellate court to issue written opinions that are as brief as practicable but that address all issues necessary to a final disposition of the case being appealed); *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 2, 2015
Opinion Delivered August 13, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.