**Opinion issued March 16, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-16-00806-CV**

————————————

## IN THE INTEREST OF T.L.B. JR. A/K/A T.B.

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-05274J**

---

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between T.M.J. ("Mother") and her two-year-old son, T.L.B. On appeal, Mother identifies five issues, asserting that the evidence was not legally or factually sufficient to support the trial court's judgment. Because we hold that the evidence was legally and factually sufficient, we affirm.

## Background

On September 14, 2015, the Department of Family and Protective Services ("the Department") filed suit, seeking to terminate Mother's parental rights to T.L.B. and to obtain sole managing conservatorship if family reunification could not be achieved. In the petition, the Department also sought temporary managing conservatorship and requested emergency orders.

With respect to the emergency orders, the Department asserted that the Department had taken possession of T.L.B. on September 12, 2015. To support the request for emergency order, the Department offered the affidavit of caseworker T. Duncan.

In her affidavit, Duncan testified that, on April 29, 2015, the Department "received an intake referral" reporting that T.L.B.'s caregiver, Tiffany, had physically abused Mother in front of one-year-old T.L.B. In the affidavit, Duncan indicated that Tiffany was Mother's "paramour." Duncan further indicated that Tiffany's father, L.J., was the biological father of T.L.B.

With regard to the physical abuse, the report indicated that Tiffany had punched Mother while she was holding T.L.B. The referral had stated that Tiffany "assaulted [Mother] by throwing a picture frame at her and using pepper spray on her." The picture frame hit T.L.B. in the back of the head, and T.L.B. "began to wheeze when [Tiffany] sprayed the pepper spray."

Duncan stated that the Department received another referral on June 18, 2015, "alleging neglectful supervision" of T.L.B. The report indicated that Tiffany was "using drugs" while caring for T.L.B.

Duncan explained in her affidavit that, following the referrals, CPS began an investigation. Duncan was part of the investigation. CPS learned that Tiffany, not Mother, was the primary caregiver for T.L.B. During the investigation, Tiffany did not want to speak to CPS and referred CPS to her attorney; however, neither Tiffany nor her attorney were cooperative during the investigation. Ultimately, in August 2015, Tiffany told Duncan that "she would not allow [Duncan] to see T.L.B." On September 11, 2015, Duncan and a CPS investigator could not locate T.L.B. They learned that Tiffany had been "evicted from her apartment due to the domestic disputes that occurred at her apartment." Tiffany learned that CPS was trying to locate her and contacted Duncan. When Duncan went to Tiffany's new residence, Tiffany would not allow Duncan inside the residence but spoke to Duncan at the front door. T.L.B. was then removed from the home by the Department.

Duncan testified in the affidavit that Mother and Tiffany each had a "CPS history." Mother's parental rights had been terminated with respect to another child, an infant, in 2012, following reports that Mother had "placed [the child] at

3

risk of harm due to inadequate supervision, chronic domestic violence, drug use and inadequate medical attention."

The Department had also received two referrals for "negligent supervision" of T.L.B. in 2014. During the investigation of the first 2014 referral, Mother tested positive for marijuana. The second 2014 referral was made after Mother and Tiffany were both arrested on outstanding warrants, and there was no one to care for T.L.B. Duncan averred that the Department received another referral in 2015 for negligent supervision of T.L.B. when it was reported that Mother smoked marijuana around T.L.B.

In her affidavit, Duncan further indicated that Mother and Tiffany had criminal histories. Mother had a criminal history for theft, and Tiffany had a lengthier criminal history involving offenses of burglary, theft, forgery, and possession of a controlled substance.

Duncan concluded her affidavit by asserting that the Department should be named T.L.B.'s temporary managing conservator "due to the mother's prior [Department] history, drug history, extensive domestic violence history, and her lack of cooperation with [the Department]." Duncan further stated, "At the time of removal[,] the child was being cared for by [Tiffany]. [Tiffany] is not a parent of this child. She is not an appropriate caregiver, due to her domestic violence history

4

with the mother, drug history, and history of not cooperating with [the Department]."

On September 14, 2015, the trial court signed an emergency order for the protection of T.L.B. In the order, the trial court indicated that it had "examined and reviewed" Duncan's affidavit. The trial court found that T.L.B. had been removed pursuant to Family Code section 262.104, which authorizes possession without a court order if circumstances would lead a person of ordinary prudence and caution to believe that the child faced "an immediate danger to [his] physical health or safety."[1] The court also found that T.L.B. faced a continuing danger to his physical health or safety if returned to "the parent" or "caretaker." The trial court appointed the Department as the temporary managing conservator of the children.

Following a full adversary hearing, the trial court signed a temporary order on October 23, 2015. In the order, the trial court found as follows:

> [T]here is sufficient evidence to satisfy a person of ordinary prudence and caution that (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; (2) the urgent need for protection required the immediate removal of the child and makes efforts to eliminate or prevent the child's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the child's removal and enable the child to return home, there is a substantial risk of a continuing danger if the child is returned home.

---

[1] *See* TEX. FAM. CODE ANN. § 262.104 (Vernon Supp. 2016)

The trial court further found there was "sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child." The trial court appointed the Department as T.L.B.'s temporary managing conservator.

The Department prepared a family service plan and filed it with the trial court on November 5, 2015. The plan set out several tasks and services for Mother to complete before reunification with T.L.B. could occur. Specifically, Mother was required to do the following: (1) attend all scheduled appointments and provide copies of certificates to demonstrate attendance at the required services; (2) participate in all court hearings; (3) "maintain housing for a minimum of six consecutive months that is safe, stable, and free of environmental hazards" and "provide [case] worker with a copy of the signed lease agreement"; (4) "submit to random drug/alcohol testing" and "not test positive for any illegal drugs or any drugs that were not prescribed to her"; (5) "complete a drug and alcohol assessment/evaluation"; (6) "actively participate in domestic violence counseling," from which Mother "will be successfully discharged from counseling and provide the [case] worker with a copy of the certificate of completion"; (7) complete a psycho-social evaluation; (8) actively participate in individual therapy; (9) seek and maintain full time employment and "provide the caseworker with monthly

6

income statements to verify the legitimacy of the employment"; and (10) participate in and complete at least eight weeks of parenting classes and provide the caseworker with a certificate of completion. The timeframe for Mother to complete each of these tasks and services was "11/10/2015 thru the duration of the case."

The service plan warned Mother:

THE PURPOSE [OF THE SERVICE PLAN] IS TO HELP YOU PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT WITHIN THE REASONABLE PERIOD SPECIFIED IN THE PLAN. IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU.

The trial court conducted a status hearing on November 10, 2015. Mother and her counsel attended the hearing. That same day, the trial court signed a status hearing order, which approved and incorporated the service plan by reference. Specifically, the order provided: "[T]he plans of service for [Mother] filed with the Court, and incorporated by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of this Court." The trial court also found that Mother had reviewed the service plan, understood the plan, and had signed it.

Mother and her attorney attended a permanency hearing on May 19, 2016. That same day, the trial court signed a "Permanency Hearing Order Before Final

7

Hearing." The trial court ordered, "The actions specified in each service plan . . . on file as of the date of this order represent actions which this Court requires of the Parent specified in the service plan[.]" The order also provided "that all previous orders issued by this Court shall continue without modification." The order made clear that "the actions [required in the service plan must] be performed in order for the parent to regain custody of the child who [is] presently in the temporary managing conservatorship of the Department." At the bottom of the order, the trial court set trial for September 1, 2016.

The case was tried to the bench on September 1, 2016. The Department sought to terminate the parent-child relationship between Mother and T.L.B.[2]

At trial, the Department offered the testimony of the Department caseworker R. Nelson. She testified that two-year old T.L.B. was "fine" and healthy when he came into the Department's care; however, the Department's "concern was that he [was] exposed to domestic violence and the lack of cooperation with Mom and her girlfriend [Tiffany] at the time." Nelson stated that T.L.B. had been "removed from the home" because of domestic violence. She testified that the referral to the Department had "involved [Mother] and her boyfriend [sic] at the time [Tiffany] . . . . [T]he referral indicated that Tiffany [] punched [Mother] in the face while

---

[2]     The parental rights of T.L.B.'s father were also terminated following the trial. However, the father did not appear at trial, and he does not appeal the termination of his parental rights.

holding [T.L.B.]." Nelson testified that the referral had indicated that, during the altercation, T.L.B. was "hit in the back of the head with a picture frame." During questioning, Nelson agreed that, "[w]hen the case came in, several officers testified at the show cause [hearing] about the domestic violence between the mother and Tiffany." She confirmed that there had been "at least" ten referrals for domestic violence, but Mother had "refused to press charges" against Tiffany. Nelson also confirmed that Tiffany had "a violent criminal history." Nelson agreed that, while the case was pending, Tiffany had threatened Nelson, Nelson's children, and the Department's attorney.

Nelson agreed that one of the reasons that the Department was requesting termination of the parent-child relationship was Mother's continued drug use. Nelson confirmed that Mother had positive drug tests while the case was pending. She stated that Mother had testified positive for marijuana and cocaine use. The Department offered into evidence lab reports, showing that the Mother had tested positive for marijuana in September 2015, for cannabinoids in November 2015, and for cocaine in February 2016. Nelson confirmed that Mother was pregnant with another child when she tested positive for marijuana, cocaine, and cannabinoids. Mother gave birth to a daughter in April 2016.

Nelson also testified that Mother had not completed the tasks and services required in the family service plan, even though the Department had made referrals

for the services. Nelson stated that "[Mother] could have already completed the services on this service plan," but she indicated that Mother was "just now" engaging in services.

Nelson testified that Mother claimed to be engaging in many of the required services, but Nelson confirmed that the service plan required Mother to provide verification of completion of the services. Nelson stated that Mother had provided verification of completion of only one service: the psychosocial evaluation. Nelson stated that the psychosocial evaluation had resulted in Mother being referred for substance abuse counseling and domestic violence classes, which Mother also had not completed.

On cross-examination, Nelson acknowledged that Mother had reported to her that she was working two jobs. However, Nelson testified that Mother had not provided her with proof of employment as required by the service plan. Nelson also acknowledged that Mother had reported to her that she had rented her own apartment, which "had a place" for T.L.B., but Nelson further stated that Mother's claim of renting a suitable apartment also had not been confirmed. Nelson also acknowledged that Mother's last drug test was negative.

In addition, Nelson testified regarding the family structure in this case. She stated that T.L.B.'s father, L.J., is also the father of Tiffany, Mother's girlfriend. Thus, Tiffany is T.L.B.'s sibling. Nelson indicated that it was her understanding

10

that Mother and L.J. had sex to "make [T.L.B.]" to provide a child for Mother and Tiffany to parent as a couple. Nelson also confirmed that L.J. was married and a registered sex offender.

On direct examination, Nelson agreed that, when he came into the Department's care, "[T.L.B.] was evaluated by Early Childhood Intervention due to some pretty severe delays." The evaluation showed that T.L.B. was developmentally delayed, and the evaluator, who examined T.L.B., was concerned that T.L.B. "was severely neglected." To address the delays, ear tubes were placed in T.L.B.'s ears "because he wasn't hearing properly." T.L.B. also received speech therapy, which he continued to receive at the time of trial. Nelson stated that there has been "a drastic improvement in [T.L.B.'s] development" since being in the Department's care.

In addition, Nelson testified that T.L.B. is currently in a foster home where T.L.B. is doing "very well" and has bonded with his foster family. T.L.B.'s younger sibling, the baby Mother gave birth to in April 2016, is also placed in the foster home. The foster parents have committed to adopting both children. Nelson stated that T.L.B. identifies his foster parents as his mother and father. However, she also agreed that Mother and T.L.B. respond well to each other and that he still thinks of her as his mother. Nelson also stated that she had witnessed Mother's visits with T.L.B. and that they are "appropriate."

11

The Department also offered the testimony of T.L.B.'s foster mother. She stated that she has been caring for T.L.B. for three-and-one-half months. She confirmed that T.L.B. is growing, healthy, and happy. She also confirmed that she and T.L.B. are bonded and that she wishes to adopt him. She testified that she provides T.L.B. a safe and stable home where all of his needs are being met. The foster mother also agreed that T.L.B.'s behavior has improved since he had been living in her home and that his delays in development have improved "tremendously."

On cross-examination, the foster mother stated that she had observed the interactions between Mother and T.L.B. during the pick-up and drop-off times of her visitations with him. She acknowledged that the interactions between them seemed appropriate and that they seemed to love one another.

Mother also testified at trial. She stated that she works at a hair salon and has a part-time job at a fast-food restaurant. Mother testified that, since she has been working, she had provided support to T.L.B. in the form of clothes, food, and toys. Mother also testified that she had signed a lease for an apartment in June 2016. She offered pictures of the apartment and testified that T.L.B. would have his own room.

Mother indicated that she was aware of the programs she was required to attend under the family service plan. She stated that she was "halfway through"

12

"the substance abuse and alcohol assessment" and had started the "one on one counseling." She also stated that she was "almost done" with a domestic violence program and had completed an eight-week parenting class.

When asked whether T.L.B. had ever been "injured in an episode of domestic violence," Mother responded "no." She also indicated that she had never filed domestic-abuse charges against Tiffany, stating that there had never been "no violence." On cross-examination, Mother acknowledged that, at a "show cause hearing," "several officers" had testified that there had been domestic-violence calls made involving her and Tiffany. Mother averred that the officers' testimony was "hearsay" and stated that she did not make the calls.

At the conclusion of trial, the court granted the Department's request for termination of the parent-child relationship between Mother and T.L.B. On September 22, 2016, the trial court signed a judgment terminating Mother's parental rights, finding that termination was in T.L.B.'s best interest and that Mother had engaged in the predicate acts listed in Family Code Subsections 161.001(b)(1)(D),(E), and (O). The trial court also appointed the Department to be T.L.B.'s sole managing conservator.

Mother now appeals the trial court's judgment, challenging the termination of her parental rights. She identifies two global issues, with a number of sub-

issues, challenging the legal and factual sufficiency of the evidence to support the trial court's judgment.

## Sufficiency of the Evidence

In two global issues, with a number of sub-issues, Mother claims that the evidence was not legally or factually sufficient to support the trial court's findings that she had committed a predicate act necessary for termination or to support the trial court's determination that termination was in T.L.B.'s best interest.

### A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.001(b) (Vernon Supp. 2016). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier

of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id*. We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not

15

have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B.    Predicate Finding under Subsection 161.001(1)(O)

Mother asserts that the evidence was legally and factually insufficient to support the trial court's predicate finding that termination was warranted under Family Code subsection 161.001(1)(O). Family Code subsection 161.001(b)(1)(O) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence

> that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under [Family Code] Chapter 262 for the abuse or neglect of the child.

16

TEX. FAM. CODE ANN. § 161.001(b)(1)(O).  Thus, pursuant to Subsection (O), the Department must prove that (1) it has been the child's temporary or permanent managing conservator for at least nine months; (2) it took custody of the child as a result of a removal from the parent under Chapter 262 for abuse or neglect; (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child; and (4) the parent did not comply with the court order.  *See id.*  Here, Mother asserts that the evidence was not legally or factually sufficient (1) to show that T.L.B. was removed from her under Chapter 262 for abuse or neglect or (2) to show that there was a court order specifically establishing the actions necessary for her to take to obtain the return of T.L.B.

*1.  Removal under Chapter 262 for abuse or neglect*

We interpret the words "abuse" and "neglect" broadly to necessarily include the risks or threats of the environment in which the child is placed.  *In re J.R.W.*, No. 01–14–00442–CV, 2014 WL 6792036, at *5 (Tex. App.—Houston [1st Dist.] Nov. 26, 2014, no pet.) (mem. op.) (citing *In re E.C.R.*, 402 S.W.3d 239, 246, 248 (Tex. 2013)).  In *E.C.R.*, the supreme court considered whether the evidence was sufficient to support the trial court's determination that the children involved had been removed because of abuse or neglect.  *Id.* at 246.  In so doing, the court considered an affidavit that the Department had filed in support of its petition, in which the affiant noted allegations that the child's sibling had been physically

abused. *Id.* at 248. The supreme court noted that, "[t]his affidavit, even if not evidence for all purposes, shows what the trial court relied on in determining whether removal was justified." *Id.* The trial court found "sufficient evidence to satisfy a person of ordinary prudence and caution that [the child] faced an immediate danger to his physical health or safety, that the urgent need to protect him required his immediate removal, and that he faced a substantial risk of a continuing danger if he were returned home [.]" *Id.* The supreme court then held that the affidavit and the trial court's unchallenged findings in the temporary order, which authorized the child's removal, were sufficient evidence to establish, as a matter of law, that the child had been removed under chapter 262 for abuse or neglect.[3] *Id.* at 249.

---

[3] In *E.C.R.*, the supreme court cited a number of decisions in which courts have held that documentary evidence, including caseworker affidavits, offered in support of the Department's petition and the trial court's temporary orders for removal were sufficient evidence to show that the child had been removed for abuse or neglect. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (citing *D.F. v. Tex. Dep't of Family & Protective Servs.*, 393 S.W.3d 821, 830–31 (Tex. App.—El Paso 2012, no pet.) (noting that trial court's finding of immediate danger to child's physical health or safety or that children were neglected or abused supported finding of neglect); *In re S.N.*, 287 S.W.3d 183, 190 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that affidavit, family service plan, and temporary orders showing danger to physical health or safety and substantial risk of continuing danger supported finding that children were removed under Chapter 262 for neglect); *In re J.S.G.*, No. 14–08–00754–CV, 2009 WL 1311986, at *6–7 (Tex. App.— Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (relying on caseworker's affidavit in support of Department's removal request, as well as trial court's temporary orders concluding that children faced danger to their physical health or safety and substantial risk of continuing danger if returned home, to conclude that evidence established that children were removed "as a result of neglect specific to

Here, the Department's original petition, seeking emergency temporary orders, conservatorship, and termination of parental rights, filed on September 14, 2015, was supported by caseworker Duncan's affidavit. In the affidavit, Duncan testified regarding allegations of domestic abuse between Tiffany and Mother that had directly affected T.L.B. Duncan testified that in April 2015 the Department received a report that Tiffany had punched Mother while Mother was holding T.L.B. and that Tiffany had "assaulted [Mother] by throwing a picture frame at her and using pepper spray on her." The picture frame had reportedly hit T.L.B. in the back of the head, and T.L.B. had begun "to wheeze when [Tiffany] sprayed the pepper spray." She stated that in June 2015 the Department learned of allegations that Tiffany, who was T.L.B.'s primary caregiver, was "using drugs."

Duncan further testified that Tiffany had not been cooperative with CPS's investigation into the allegations. In August 2015, Tiffany refused to allow Duncan to see T.L.B. The following month, the Department could not locate Tiffany and T.L.B. The Department learned that Tiffany had been evicted from her apartment for domestic abuse issues.

During the investigation, CPS learned that Mother and Tiffany had a history with CPS involving allegations of past neglectful supervision of T.L.B. and for

them by" mother); *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (considering affidavit in support of removal and trial court's temporary orders finding continuing danger to physical health or safety of child if returned to parent as evidence that child was removed because of neglect)).

drug use. Duncan also determined that Mother had her parental rights terminated to another child in 2012 following reports that Mother had "placed [the child] at risk of harm due to inadequate supervision, chronic domestic violence, drug use and inadequate medical attention."

At the end of her affidavit, Duncan averred that the Department should be named T.L.B.'s temporary managing conservator "due to the mother's prior [Department] history, drug history, extensive domestic violence history, and her lack of cooperation with [the Department]." Duncan further stated, "At the time of removal[,] the child was being cared for by [Tiffany]. [Tiffany] is not a parent of this child. She is not an appropriate caregiver, due to her domestic violence history with the mother, drug history, and history of not cooperating with [the Department]."

In the order for emergency protection signed by the trial court on September 14, 2015, the trial court indicated that it had "examined and reviewed" Duncan's affidavit. The trial court found that T.L.B. had been removed pursuant to Family Code section 262.104, which authorizes possession without a court order if circumstances would lead a person of ordinary prudence and caution to believe that the child faced "an immediate danger to [his] physical health or safety." *See* TEX. FAM. CODE ANN. § 262.104 (Vernon Supp. 2016). The court also found that T.L.B. faced a continuing danger to his physical health or safety if returned to "the parent"

20

or "caretaker."  The trial court appointed the Department as the temporary managing conservator of the children.

Following a full adversary hearing, the trial court signed a temporary order on October 23, 2015.  In the order, the trial court found as follows:

> [T]here is sufficient evidence to satisfy a person of ordinary prudence and caution that (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; (2) the urgent need for protection required the immediate removal of the child and makes efforts to eliminate or prevent the child's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the child's removal and enable the child to return home, there is a substantial risk of a continuing danger if the child is returned home.

The trial court further found there was "sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child."

At trial, caseworker Nelson testified that, although T.L.B. had been "fine" and "healthy" when removed from Mother's custody, T.L.B. had been "removed from the home" because of domestic violence.  She testified that the referral to the Department had "involved [Mother] and her boyfriend [sic] at the time [Tiffany] . . . . [T]he referral indicated that Tiffany [] punched [Mother] in the face while holding [T.L.B.]."  Nelson testified that the referral had also indicated that, during the altercation, T.L.B. was "hit in the back of the head with a picture

21

frame." During questioning, Nelson agreed that, "[w]hen the case came in, several officers testified at the show cause [hearing] about the domestic violence between the mother and Tiffany." She confirmed that there had been "at least" ten referrals for domestic violence, but Mother had "refused to press charges" against Tiffany, who, Duncan's affidavit had shown, was T.L.B.'s primary caregiver.

Duncan's affidavit offered in support of the Department's original petition, the unchallenged findings by the trial court in its temporary orders for emergency protection and for continued removal of T.L.B., and Nelson's trial testimony is the type of evidence relied on by the supreme court in *E.C.R.* to conclude that "E.C.R. was removed from [her mother] under chapter 262 for abuse or neglect." *E.C.R.*, 402 S.W.3d at 248; *see also In re J.R.W.*, 2014 WL 6792036, at *6 (citing *In re R.M.S.*, No. 01–13–00331–CV, 2013 WL 5637703, at *3–4 (Tex. App.—Houston [1st Dist.] Oct. 11, 2013, no pet.) (mem. op.) (concluding caseworker's affidavit and trial court's temporary order removing child from mother's home was type of evidence on which *E.C.R.* court relied in determining that evidence was sufficient to support trial court's finding that child had been removed for abuse or neglect)). As the *E.C.R.* court made clear, "'abuse or neglect' of the child necessarily includes the risks or threats of the environment in which the child is placed." *E.C.R.*, 402 S.W.3d at 248. Thus, we conclude that Duncan's affidavit, the unchallenged findings in the trial court's temporary orders, and Nelson's trial

22

testimony establish that T.L.B. was removed from Mother under chapter 262 for abuse or neglect.  *See id.* at 248.

### 2.  *Court order specifying necessary actions*

Mother also intimates that the evidence was legally and factually insufficient to show that there was a court order specifically establishing the actions necessary for her to take to obtain the return of T.L.B.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).  Mother first asserts that the Department did not prove that the family service plan was a court order.  We disagree.

At trial, the status hearing order signed by the trial court on November 10, 2015 was admitted into evidence.  In the order, the trial court expressly ordered that "the plans of service for [Mother] filed with the Court [on November 5, 2015], and incorporated by reference as if the same were copied verbatim in this order, is APPROVED and made an ORDER of this Court."  Thus, the evidence showed that the family service plan was an order of the trial court.

Mother also asserts that the Department did not show that she had received a copy of the service plan and, thus, she was not aware of the plan's requirements. She points out that the copy of the service plan admitted at trial as an exhibit did not contain her signature but contained only the signature of the Department's representative.  However, in the status-hearing order, admitted into evidence, the trial court expressly found that Mother had signed the service plan.  The trial court

also found that Mother had reviewed the service plan and understood it. The trial court further found that

> unless she is willing and able to provide the child with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan, her parental and custodial duties and rights may be subject to restriction or to termination or the child may not be returned to her.

In addition, while the evidence showed that Mother had not completed the tasks and services required in the court-ordered service plan, evidence was presented at trial, including Mother's own testimony, indicating that she had completed one of the required services, and she had partially completed several other services. In addition, the evidence showed that Mother had taken a number of the drug tests required by the service plan. A reasonable factfinder could have inferred from Mother's partial compliance with the service plan that she was aware of its existence and its content. *See In re K.N.D.*, No. 01–12–00584–CV, 2014 WL 3970642, at *7 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g).

Finally, Mother contends that the evidence did not show that the court-ordered service plan was sufficiently specific for her to comply with its terms because it did not contain a date by which she had to complete all the plan's requirements. The record does not support Mother's claim.

The service plan had a column titled "Task/Service including timeframes." In the column, the task or service Mother was required to complete was described. Before the description of each task was the following: "11/10/2015 thru duration of the case," indicating that the timeframe for Mother to complete the task or service was during the pendency of the case.

The record shows that the trial court conducted a permanency hearing on May 19, 2016, which was attended by Mother and her attorney. Following the hearing, the trial court signed an order setting trial for September 1, 2016.[4] Thus, at that point, Mother knew that the "duration of the case" would end on September 1, 2016 and that she would need to have her services completed by that time.

Reviewing all of the evidence in the light most favorable to the termination findings, we conclude that a reasonable fact finder could have formed a firm belief or conviction as to the truth of the termination findings under subsection (O). *See J.F.C.*, 96 S.W.3d at 266. In light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the termination finding under subsection (O) is not so significant that a fact finder could not reasonably

---

[4]     The May 19, 2016 permanency order was not admitted into evidence; however, "in a bench trial, we may 'presume the trial court took judicial notice of its record without any request being made and without any announcement that it has done so.'" *In re K.N.D.*, No. 01–12–00584–CV, 2014 WL 3970642, at *7 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g) (quoting *In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)).

25

have formed a firm belief or conviction as to the truth of the termination finding under that subsection. *See H.R.M.*, 209 S.W.3d at 108. We hold that the evidence is legally and factually sufficient to support the trial court's predicate finding under Subsection (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

We overrule Mother's sub-issues challenging the legal and factual sufficiency of the trial court's Subsection (O) finding. [5]

## C.    Best-Interest Finding

Mother also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in T.L.B.'s best interest.

### 1.    *Legal Standards*

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2016).

---

[5]    Because only one predicate ground is needed to support a termination order, we need not address Mother's other sub-issues, challenging the legal and factual sufficiency of the evidence to support the trial court's findings under Subsections 161.001(b)(1)(D) and (E). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (recognizing, "Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

The Supreme Court of Texas has identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). In addition, the Texas Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b).

The evidence supporting the statutory predicate grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *H.D.*, 2013 WL 1928799, at *13.

### 2. Analysis

Multiple factors support the trial court's determination that termination of Mother's parental rights was in T.L.B.'s best interest. The trial court heard evidence that Mother engaged in illegal drug use while this case was pending and while she was pregnant with another child. Mother had three separate positive drug tests, testing positive for marijuana, cocaine, and cannabinoids. In addition, the evidence also showed that she walked out of one drug screening appointment without being tested.

Parental drug abuse reflects poor judgment and may be a factor to be considered in determining a child's best interest. *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (stating courts may consider whether there is history of substance

abuse by child's family or others who have access to child's home). Evidence relating to Mother's involvement with illegal drugs supported the trial court's best-interest finding under the following *Holley* factors: T.L.B.'s emotional and physical needs now and in the future; the emotional and physical danger to T.L.B. now and in the future; and acts or omissions indicating that the existing parent-child relationship is not a proper one. *See Holley*, 544 S.W.2d at 371–72 (listed above as *Holley* factors two, three, and eight). A parent's drug use has also been found to be a condition that can indicate instability in the home environment. *In re J.M.*, No. 01–14–00826–CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.).

In addition, caseworker Nelson testified at trial that T.L.B. had come into the Department's care because of domestic abuse between Mother and Tiffany. Nelson explained that there had been reports that Tiffany had hit Mother while she was holding T.L.B. and that T.L.B. had been hit in the head with a picture frame. There was also a report that T.L.B. had been exposed to pepper spray during an altercation between Mother and Tiffany that caused T.L.B. to wheeze. During trial, Mother acknowledged that there had been numerous reports that Tiffany had perpetrated acts of domestic violence against her, but she denied that there had ever been any violence between them.

Evidence of domestic violence in the home is supportive of a trial court's best-interest finding under the third *Holley* factor: the emotional and physical danger to the child now and in the future. *See Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(E) (providing that courts may consider whether parent has adequate skills to protect child from repeated exposure to violence although violence may not be directed at the child); *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist. ] 2003, no pet.) (stating domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest). "It is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07–09–0101–CV, 2009 WL 4348760, at *6 (Tex. App.–Amarillo Dec. 1, 2009, no pet.) (mem. op.). Here, the trial court was free to disbelieve Mother testimony, including her testimony that there had never been acts of violence committed against her by Tiffany. In addition, during her testimony Nelson agreed that Tiffany has "a pretty violent criminal history," and she testified that, while the case was pending, Tiffany had threatened her, her children, and the Department's attorney.

In addition, as discussed, Mother failed to complete all but one of the tasks and services required in her service plan. Among the required services that Mother

failed to complete were substance-abuse counseling and a domestic-violence program. The evidence showing that Mother failed to complete the required services supports the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 263.307(b)(11) (stating courts may consider the willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time). A factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *See J.M.*, 2015 WL 1020316, at *7; *see also Holley*, 544 S.W.2d at 371–72 (listing parental abilities of individual seeking custody as best-interest factor).

Given the evidence in the record, the trial court could have inferred that Mother is at risk for continuing to engage in illegal drug use and to subjecting herself and T.L.B. to domestic violence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (recognizing that trial court may measure a parent's future conduct by his past conduct). Such inference is relevant not only to the stability of Mother's home but also to the emotional and physical danger in which T.L.B. could be placed now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors three and seven).

The Department also presented evidence supportive of the best-interest finding under the following factors: the emotional and physical needs of the children now and in the future, the parental abilities of those seeking custody, and the plans for the children by those seeking custody. *See Holley*, 544 S.W.2d at 371–72 (factors two, four, six); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12) (providing that court may consider whether child's family demonstrates adequate parenting skills). The evidence indicated that T.L.B. is currently placed in a foster home with his sibling. The evidence also showed that the foster home is safe, stable, and meets T.L.B.'s needs. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of a child and affirming finding that termination was in child's best interest when child was thriving in foster care). The evidence showed that T.L.B. is bonded with his foster parents, who wish to adopt him and his younger sibling. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering child's bond with foster family in reviewing best-interest determination). The evidence further showed that, when he came into foster care, T.L.B. was developmentally delayed. However, after he received ear tubes to help with his hearing and speech therapy, his developmental delays greatly improved. *See Holley*, 544 S.W.2d at 371–72 (factor five: the programs available to assist these individuals to promote the best interest of the child).

We also note that T.L.B. was only two years old at the time of trial. As such, the *Holley* factor regarding the desires of the child is neutral in this case. *See Holley*, 544 S.W.2d at 371–72 (factor one).

Mother points out that evidence was presented weighing against the best-interest finding. She points to evidence indicating that she was working two jobs at the time of trial and that she had signed a lease for an apartment that would provide T.L.B. with his own bedroom. In addition, she highlights the evidence that she has brought food, clothing, and toys to her visits with T.L.B. However, the evidence also showed that Mother had not provided proof of her employment to the Department, and Nelson testified that she had not visited Mother's apartment to confirm the housing. Nelson also testified that Mother had brought items for T.L.B. only to her last two visits with him.

Mother also relied on evidence showing that she and T.L.B. were bonded, that they loved one another, that he still considered her to be his Mother, and that she behaved appropriately during the visits. Mother also cites Nelson's testimony that T.L.B. was "fine" and "healthy" when he came into the Department's care.

In addition, Mother points to evidence indicating that she had partially completed some of the services required in the service plan. And she points out that her last drug test was negative.

33

Although there is evidence that weighs against the best-interest finding, evidence cannot be read in isolation; it must be read in the context of the entire record. *See In the Interest of K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *16 (Tex. App.–Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). As discussed, evidence was presented indicating that Mother cannot provide a stable home for T.L.B. due to her past drug use and the reported domestic violence perpetrated by Tiffany. Evidence was also presented showing that Mother did not take the necessary steps to remedy the instability of her home while this case was pending, even though she was offered services to assist her. As the fact finder, the trial court, after assessing the credibility of the witnesses and weighing the evidence, could have reasonably inferred that Mother would continue her past behaviors, which have the potential to compromise T.L.B.'s emotional and physical well-being.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Mother and T.L.B. was in the child's best interest. *J.F.C.*, 96 S.W.3d at 266. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the

34

parent-child relationship between Mother and T.L.B. was in his best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in T.L.B.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in T.L.B.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We overrule Mother's sub-issues challenging the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.

## Conclusion

We affirm the judgment of the trial court.


                                                    Laura Carter Higley
                                                    Justice

Panel consists of Justices Jennings, Higley, and Massengale.