**In the Interest of A.P. and
J.P., Minor Children.**

No. 05–05–00419–CV.

Court of Appeals of Texas,
Dallas.

Feb. 21, 2006.

Carl Hadigian, Assistant Public Defender, Dallas, for appellant.

Angie Holmes, Dallas County District Attorney's Office, Dallas, for appellee.

Marisa P. Elmore, Assistant District Attorney, Dallas, for state.

Before Justices WRIGHT, O'NEILL, and FRANCIS.

## OPINION

Opinion by Justice WRIGHT.

Jennifer P. (mother) appeals the trial court's judgment terminating her parental rights to A.P. and J.P. In a single issue, mother contends the evidence is factually insufficient to show that termination was in the children's best interest. We overrule mother's sole issue and affirm the trial court's judgment.

### Background

Mother, who was twenty-four-years-old at the time of trial, testified that she was involved with Child Protective Services (CPS) as a child because her mother was neglectful, she was sexually abused by her mother's friend, and she often went to school dirty and bruised. According to mother, she dropped out of school after seventh grade and began using drugs when she was fourteen. She was fifteen when she became pregnant with A.P. She stopped using drugs while she was pregnant, but after A.P. was born, she began smoking marijuana frequently. She started using cocaine when she was twenty-one.

Mother described her relationship with the children's father [1] as "abusive. Controlling, obsessive mentally. Sometimes physically." When J.P. was about six-months-old, mother ended her relationship with father because she was "tired" and he was "getting into deeper drugs." About two months after she left father, mother went to Job Corp. A.P. and J.P. stayed with their maternal grandmother and mother saw them on the weekends. She left Job Corp. because she felt she needed

---

1. Father was incarcerated at the time of trial. After mediation, he signed an irrevocable affidavit of relinquishment and his parental rights were also terminated.

to be home with her children. Thereafter, she began using cocaine.

According to mother, she has had problems with her mental health from the time she was eleven. She testified that she has been anorexic, suicidal, and has recently been diagnosed as bi-polar. She first attempted to commit suicide when she was eleven or twelve, and when asked about this at trial, she claimed she was not institutionalized at that time. However, her medical records indicate she told both Timberlawn and Green Oaks Hospitals that she was institutionalized for two years when she first attempted suicide. Mother also gave a medical history of attempting suicide "two hundred or more times" but at trial said it was about twenty-five times. She explained that she was "probably lying" and was on drugs at the time she gave the medical histories and she "said a lot of things" that were not true.

CPS became involved with A.P. and J.P. in November 2003 after mother took A.P. to Children's Hospital "to try to get a rape kit." Mother did so because A.P.'s behavior, such as running the faucet over her genital area and soiling herself, made mother concerned about sexual abuse. When mother asked A.P. about her behavior, she told mother it was "because [mother] was having too many male companions over" and that mother was not paying attention to her when they were there. A.P. also told mother that "some guy" had touched her vagina. Later, CPS received a second referral for neglect after A.P. and J.P. went to school dirty and had lice.

During the time CPS was working with the family, mother attempted to commit suicide after A.P. told her she was "messing [A.P.] up." At the time, mother was "doing drugs really hard." Mother was also taking prescription medication because she was "seeing and hearing things that [she] couldn't control." Mother was

very upset about what A.P. had told her so she took "a whole bunch of pills" and then "used some cocaine to enhance it." She woke up some time later at Baylor Hospital. Two or three weeks later, mother cut her arm with "a blade" because she was in "so much pain [she] had to release, and [she] cut [her] arm to release the emotional pain." A.P. saw the cuts on mother's arm and made her hold a towel on it.

After talking with her case worker, mother admitted herself to Timberlawn Hospital. She stayed a few days and then asked to be released. However, she continued to hear voices and was still using drugs. A.P. and J.P. were removed from her care a few days later. Mother admitted that at that time, her "life was absolutely out of control."

Since that time, mother has stopped using drugs after completing both an intensive out-patient program and a supportive out-patient program. She has been consistently drug tested by CPS since April 2004 and has not had a positive drug test. Mother has also been prescribed different medication and her mental state is much more stable. Mother testified she has completed about thirty parenting classes—ten sessions that focused on both children's age group; ten sessions that focused on A.P.'s age group; and ten sessions that focused on J.P.'s age group. Mother also attends both couples therapy and individual therapy. She has remarried and has had a job for almost a year, the longest she has ever held a job. Her husband is also employed, and they have a two bedroom apartment which CPS determined was suitable for the children.

Joseph Mark DeYoung testified he is a therapist for A.P. and J.P. At the time of trial, A.P. was seven-years-old and J.P. was three-years-old. DeYoung had been working with the girls weekly for about seven months. DeYoung described A.P.

as a very anxious child, evidenced by facial ticks and frequent references to "secrets" and imaginary friends. She also has difficulty with encopresis and enuresis.[2] DeYoung described J.P. as having issues "with defiance and also pretty significant amounts of encopresis and enuresis. General refusal to participate in any kind of toilet training." J.P. also frequently "space[s] out or blank[s] out" where she stares into space or wanders off and seems to be "kind of off in another place." DeYoung observed that both A.P. and J.P. became more anxious and defiant after visiting with mother. In DeYoung's opinion, the girls did not have a secure attachment with mother, and their sense of security worsened surrounding mother's visits.

According to DeYoung, the problems he described are "absolutely" related to past trauma and chaos in the home. At one time, the girls did not see mother for a three-week period and their behavior "greatly improved." The girls were much "brighter and much more relaxed, much more engaged with the caregivers." Later, when CPS increased the visits to see how well mother could deal with the children, DeYoung expected their attachment with mother to increase and the visits to be more relaxed. DeYoung observed, however, that the girls' level of attachment with mother is decreasing and getting worse. In DeYoung's opinion, reunification is not an appropriate goal, the children do not feel secure around their mother, and there has been some type of relational injury that is unlikely to ever be repaired. DeYoung believed that if mother's rights were terminated the girls would more likely feel a sense of security and he would be able to help the girls form attachments with others. If the girls were returned to mother's care, DeYoung thought they would continue to reexperi-

ence the trauma of mother's suicide attempt and drug use.

Laura Hastings testified she is a psychologist and observed mother and the girls together. She did not have any concerns about bonding between them. Hastings did, however, have concerns about mother's "lack of awareness of appropriate boundaries ... between the parent and child." Mother lacked confidence in her authority with them and would placate rather than setting limits. Based on Hastings observations and her review of psychological evaluations that had been done on the girls, Hastings believed mother's relationship with the girls was more of a sibling relationship than an parent-child relationship. In Hasting's opinion, the girls require a "whole lot of structure" and mother would not be able to provide it.

Melony Skipper–Relyea testified she is a licensed professional counselor and mother is her client. Skipper–Relyea described mother as "very motivated" and willing to take suggestions. Skipper–Relyea thought if mother was not providing enough structure for the girls, mother would be open to taking suggestions and changing. In Skipper–Relyea's opinion, mother had made "tremendous" progress in addressing her past abuse, if mother had been depressed it was "passing," and mother's moods were stable. Skipper–Relyea also believed that much of the children's behavior relied upon by DeYoung and Hastings could be explained by anxiety caused by being in foster care and was not necessarily the result of their relationship with their mother. In Skipper–Relyea's clinical judgment, mother was "an excellent candidate for therapy and an excellent candidate to continue to improve her parenting. [Skipper–Relyea did not] see any obstacles in any mental or emo-

---

**2.** Encopresis is fecal incontinence and enure-sis is urinary incontinence.

tional states in order for her to do that, to be a competent parent."

After hearing this and other evidence, the trial court found that mother knowingly placed the children in conditions or surroundings which endangered their physical and emotional well-being, knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being, and knowingly placed the children with persons who engaged in conduct that endangered the children's physical and emotional well-being. Finally, the trial court found that termination of the parent-child relationship between mother and A.P. and J.P. was in the children's best interest. This appeal followed.

## Discussion

In her sole issue, mother contends the evidence is factually insufficient to show it was in the children's best interest to terminate mother's parental rights. After reviewing the record, we cannot agree.

■■■ Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. *See Santosky v. Kramer,* 455 U.S. 745, 747–48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re C.H.,* 89 S.W.3d 17, 23 (Tex.2002). A finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance. Thus, traditional factual standards of review do not apply to a termination finding. *C.H.,* 89 S.W.3d at 23. Rather, when reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *C.H.,* 89 S.W.3d at 27–29. We consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

■■■ When deciding the issue of best interest, a number of factors have been considered by the courts. *See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). Included among these are the following: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* This listing is not exhaustive, but does include the most important considerations. The absence of evidence about some of these considerations does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *C.H.,* 89 S.W.3d at 27. And, while no single consideration is controlling, the analysis of one factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *See id.; In re J.M.T.,* 39 S.W.3d 234, 240 (Tex.App.-Waco 1999, no pet.), *rev'd on other grounds by*

*In re J.F.C.*, 96 S.W.3d 256 (Tex.2002). In conducting this review, we are mindful that the *Holley* test focuses on the best interest of the child, not the best interest of the parent. *See J.M.T.*, 39 S.W.3d at 240.

In this case, the children did not testify and thus there is no direct evidence of their desires. However, the record shows that although the girls were well bonded with mother and initially missed her, they began to say they did not want to visit their mother. They also exhibited anxiety and were defiant after visiting with mother, but were much more relaxed and better behaved after not seeing mother for several weeks.

With respect to the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children, mother's parental abilities, programs available to assist mother, and mother's plans for the children, the record shows the following: In Hastings's opinion, mother lacked confidence in her authority with the girls, was unaware of the appropriate boundaries between parent and child, and had more of a sibling relationship than a parent-child relationship with the girls. Further, Hastings testified that because of their past, the girls required a "whole lot of structure" and Hastings did not believe mother would be able to provide it. DeYoung testified that the girls' level of attachment with mother is decreasing and that they do not feel secure around their mother. In his opinion, the relational injury that occurred due to past trauma and chaos in the home, is unlikely to ever be repaired. DeYoung believed that if the girls were returned to mother's care, they would continue to relive that injury, but if mother's rights were terminated the girls would feel more secure and would be able to form attachments with others. In contrast, Skipper–Relyea believed that because mother was motivated to change and willing to take suggestions, mother was an excellent candidate to improve her parenting skills and would be able to provide enough structure for the girls. Skipper–Relyea also testified she was willing and able to work with mother both in the office and in the home with "family work." She would do hands-on coaching about how to use time-outs, schedules, rules, the appropriate expectations for children, and problem-solving with the children, spouses, and friends. Mother had spoken with Skipper–Relyea about resuming counseling with her after Skipper–Relyea's maternity leave and mother was "very dedicated" to resuming therapy if the children were returned to her.

Neither a representative from CPS nor J.P.'s and A.P.'s foster parents testified. Thus, there is no evidence regarding CPS's plans for the children, nor the stability of the home or proposed placement for the girls.

Finally, there is no dispute that the record supports the trial court's findings that mother provided a traumatic and chaotic homelife for J.P. and A.P. She was mentally unstable, used drugs, left the girls in the care of her mother who had physically and emotionally neglected mother, and attempted suicide with the girls present. It is likewise undisputed that mother was neglected, and was both physically and sexually abused as a child. Mother was poorly educated, young, and had not had an appropriate model for parenting when she had her children. She was mentally ill and the record suggests she was not properly diagnosed or treated until after A.P. and J.P. were removed.

■ After reviewing the evidence presented and mindful of the fact that we may not reweigh that evidence or assess the credibility of the witnesses, we conclude that the trial court's determination that

termination was in the children's best interest is supported by factually sufficient evidence. In reaching this conclusion, we acknowledge mother's progress and the changes made in her life. This leads us to concern regarding the lack of evidence about CPS's involvement with and plans for the children, and about the lack of evidence regarding the abrupt change from a goal of reunification to termination shortly before the trial in this matter. Nevertheless, the question for this Court to determine is whether all the evidence, both in support of and contrary to the trial court's finding, is such that the trial court could reasonably form a firm belief or conviction about the truth of the State's allegations. Given the lengthy and extensive trauma of the girls' past with mother, the girls' anxiety after visiting with mother, expert testimony that the damage to the parent-child relationship was such that it could not be repaired, and expert testimony that mother was not capable of providing the structure necessary for the girls, we conclude the trial court could reasonably make such a determination. We overrule mother's sole issue.

Accordingly, we affirm the trial court's judgment.