**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00421-CV**
_____

**IN THE INTEREST OF L.P. AND D.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 18-09-11813-CV**

**MEMORANDUM OPINION**

In this appeal, Father seeks to overturn the trial court's judgment terminating his parental rights to his children, *Tara* and *Jason*.[1] Father filed a brief raising four issues, which we have renumbered for convenience. In issues one and two, Father argues the trial court abused its discretion (1) by resetting the trial date on the case from August 7 to August 28, 2019, without requiring the Department to file a motion to continue and (2) by denying his motion for continuance, which he filed on

---

[1] To protect the privacy of the parties involved in the appeal, we identify the parents and their children by using pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d).

1

September 6, 2019, regarding a later trial setting, which was on September 9, 2019. In issue three, Father argues the Department failed to produce enough evidence to support the trial court's finding that it is in Tara's and Jason's best interest to terminate his parental rights.[2] In Father's fourth issue, he argues his trial attorney, whom he retained for the trial, provided him with constitutionally ineffective assistance of counsel. In the same issue, Father also suggests the attorney ad litem, whom the trial court appointed to represent his children, breached the same duty.

Because Father's arguments supporting his issues lack merit, we will affirm.

Background

The parties tried the case in September 2019. At that time, Tara was fifteen years old and Jason was thirteen. Nine witnesses, including Father, testified in the trial. The testimony shows that Father and Mother separated in 2008, while living in the State of New York. When Mother left Father, she left Tara and Jason with Father.[3] Father continued to live, with the children, in New York until 2015, when he left New York, with his children, and moved to Texas.

---

[2] *See id.* § 161.001(b) (authorizing courts to order a parent's relationship with a child terminated upon one of the predicate statutory findings listed in section 161.001(b)(1) of the Texas Family Code when that finding is coupled with another finding that terminating the relationship is in the child's best interest).

[3] The trial court also terminated Mother's parental rights to the children. *See id.* § 161.001(b)(1)(D), (E), (N), (O), (b)(2). Mother did not file an answer in the

2

The evidence in the trial shows Father abused alcohol for at least twenty years. He acquired five convictions for driving while intoxicated (DWI) before the court tried the parental termination case at issue in this appeal. In 2002, Father was charged and convicted in the State of New York on a DWI. He was convicted of a second DWI in 2007, again in New York. Father received a three-year sentence on his second DWI, but the court then placed him on probation and ordered that he undergo outpatient counseling so that he could receive treatment to help him avoid further problems related to his abuse of alcohol. Father, however, never completed the outpatient treatment required by his order of probation. Instead, Father chose to serve his three-year sentence by reporting to jail on weekends. While in jail, Tara's and Jason's grandmother cared for them.

Father received a third DWI in 2010. On the third DWI, a court in the State of New York sentenced Father to serve a five-year sentence. Once again, the court probated the sentence and placed Father on probation. And once again, Father chose to serve his sentence by reporting to jail each weekend rather than going through an outpatient treatment program designed to help him stop abusing alcohol. While Father was in jail, Father's mother-in-law cared for Tara and Jason. In the trial of his

---

suit, and she also did not file a brief to appeal from the judgment terminating her parental rights.

parental termination case, Father agreed that when he was not in jail, he continued to drink alcoholic beverages even though he had been convicted of committing three prior DWIs.

In 2015, Father was charged in the State of New York with committing a fourth DWI. Shortly after he was arrested, Father moved, with the children, to Texas. Father did not resolve the case arising from his fourth DWI before he moved out of New York. In the trial of the parental termination case, Father testified he thought the State of New York would handle the criminal case arising from his fourth DWI through the mail so he thought he could move out of the state.

In 2015, based on a warrant issued by the State of New York, police arrested Father at a convenience store in Galveston, Texas. According to Father's testimony, a clerk at the convenience store in Galveston called the Galveston Police Department after she saw Father and thought he was "acting funny." While Father denied anything was wrong with him while he was there, the evidence shows that Tara and Jason were with him when he was arrested. The Department of Family and Protective Services took Tara and Jason and placed them in foster care. Following Father's arrest in Texas, he was returned to New York and jailed. In New York, the court handling his fourth DWI sentenced him to an indeterminate sentence of one to three years in jail.

4

Father served eleven months of his sentence on his fourth DWI. While in jail, Father completed outpatient treatment and received therapy for problems related to his abuse of alcohol. Father testified he quit drinking. In June 2017, Father completed his parole in New York and moved back to Texas. By October 2017, Father completed a family service plan with the Department, and the Department allowed Tara and Jason to return to Father's home.

According to Father, in December 2017, he started drinking again. Father, however, described the frequency with which he drank as "very seldom[,] [acknowledging that] maybe once" he drank to the point of intoxication. According to Father, after he started drinking again, he drank two or three beers a day.

On September 4, 2018, in Montgomery County, Texas, police arrested Father on a fifth DWI. After Father's arrest, when the Department's investigator checked to see whether any other adults were present in Father's home, the Department found Tara and Jason there but no adults. On September 5, 2018, the Department sued Father and obtained a court order, which allowed the Department to remove Tara and Jason from the home. In the suit, the Department alleged that Father's parental rights to Tara and to Jason should be terminated because he had, based on his conduct, endangered them.

Father retained an attorney to represent him against the Department in the suit. Father hired the same attorney to represent him against the Department as he hired to represent him on the criminal charge involving his fifth DWI. In October 2018, Father, along with his attorney, appeared in two preliminary hearings the trial court conducted on the Department's suit. In the first hearing, the trial court stated that, based on the information it had reviewed at that time, it would take "a complete and utter turnaround for [Father] to not get [his parental rights] terminated in this case[.]" In the same hearing, the trial court told Father the trial of the Department's case would take place "in nine months" so the children would not have to "languish and wait around for [him] for one more extra day."

In January 2019, Father's attorney of record in the suit filed by the Department filed a motion to withdraw. The motion alleges Father's attorney did not believe he could effectively represent Father in both a criminal and a civil case. That said, the motion offers no further factual allegations explaining why Father's attorney of record could not represent Father in both suits. Additionally, the record shows that (1) Father did not sign the motion to withdraw, (2) the certificate of service accompanying the motion does not show that Father was ever served with the motion, and (3) Father's attorney never obtained a hearing or ruling on the motion before the trial court in the suit filed by the Department called the case to trial. Even

6

so, after filing the motion, Father's attorney apparently assumed he had no further duties to Father and failed to attend any subsequent hearings or the trial.

Consequently, as of January 2019, Father began showing up at hearings the trial court conducted in the suit filed by the Department without an attorney. While Father was present in the January and May 2019 status hearings the trial court conducted on the Department's case, Father's attorney did not attend the hearings with his client. In the hearings, Father advised the trial court that his attorney was still representing him in the case even though he was not present. The Department's attorney advised the trial court that Father was working on completing the requirements of his family service plan, which required Father to attend meetings conducted by Alcoholics Anonymous, to complete a drug and alcohol assessment, and to obtain negative tests for the presence of substances of abuse, which included alcohol. Father's family service plan also required that Father complete a program, offered by a sponsor, designed to prevent Father from having a relapse. In the January and May status hearings, the Department told the trial court the Department's goal was to reunite Father with the children, while its secondary goal was adoption. At the conclusion of the May 2019 hearing, the trial court scheduled the case for trial on August 7, 2019, memorializing that ruling in a written order.

When the trial court called the case to trial on August 7, 2019, Father's attorney of record was not present. Once again, Father advised the trial court that his attorney of record was still representing him. The court advised Father to contact his attorney and determine why the attorney was not showing up with Father in connection with the duties the attorney had to represent Father in the lawsuit. On August 7, the Department's attorney told the trial court the Department was still planning to return Tara and Jason to Father, but that before doing so, Father needed to secure a safe place for them to live. The Department's attorney acknowledged that Father had taken a step toward that goal, as Father had recently leased an apartment but he had not yet moved in. The Department's attorney represented to the trial court that Father needed just a few more days to allow him to secure appropriate housing for his children given the fact he had a lease on an apartment that would start on August 18. On its own motion, the trial court chose to allow the parties more time, continuing the case without requiring any party to file a formal motion for continuance. The court also instructed that Father make the apartment available to the Department and to the court appointed special advocate (CASA) for an inspection on August 22. The court then removed the case from the August 7 docket and set it for trial on August 28.

On August 28, the trial court called the case to trial. Father appeared again without his attorney. When the Department's attorney asked Father whether he had an attorney, Father stated he expected his attorney to appear. The Department also announced, for the first time, that it was changing its goal in the case from reunifying the family to terminating Father's rights. Explaining the decision to change goals, the Department's attorney told the trial court the Department had recently developed concerns about whether Father could provide Tara and Jason with a safe and stable home. To explain the change in goals, the Department's attorney stated the Department had recently learned that Father had falsified his lease by including a lessee's name on the lease who was not actually leasing the apartment so that Father could arrange to have water utility services connected at his apartment. The Department's attorney also told the trial court that Jason had expressed the desire to return home to Father, but that Tara had expressed her desire to continue living with her foster parents.

Under the circumstances, the trial court chose to remove the case from the docket and continue it to September 9. Explaining why it did so, the trial court advised the parties on August 28 that "this is now a very, very serious matter" and that Father needed to sort out the issues he was having with his attorney. The trial court also explained why it did not allow the parties more time, stating it set the trial

on September 9 because it is the statutory try or dismiss deadline that, under the Family Code, applied to the suit.[4]

On September 6, a new attorney filed a notice to appear as Father's attorney of record. On that same day, Father's new attorney moved to continue the case from its September 9 trial setting. The attorney verified the motion to continue, asserting he needed more time to prepare for the impending trial in light of the recent change in the Department's goals and the fact he had only recently been hired.

On the morning of September 9, the trial court heard Father's motion to continue but denied the motion at the conclusion of the hearing. The trial court found that Father, during the hearing and in his motion, had not proven there were any extraordinary circumstances that justified extending the case beyond the try or dismiss deadline of September 9.[5] While the trial court did not provide the parties with written findings of fact, the court indicated in the hearing that Father failed to rectify the problems he was having with his attorney earlier given the problems first cropped up when the attorney failed to attend the January 2019 status hearing with

---

[4] *See id.* § 263.401(a) (providing for a mandatory dismissal of termination proceeding after one year if a trial on merits has not started or a proper extension has not been obtained).

[5] *Id.*

Father when Father appeared in court in response to the notice of hearing he received in the case.

After the trial court denied the motion to continue, the trial began. The Department called just one witness, Alex Garcia, on the first day of the trial. Garcia answered eight questions before the trial court announced the court would be in recess. On September 9, Garcia testified that he is Father's employer, he has known Father since they were children, and that he could return to court to finish his testimony on October 16.

On October 16-17, the trial court heard the remaining testimony in the trial. Father, along with eight other witnesses, testified over the remaining two days of the trial. Tara and Jason were not called as witnesses in the trial. Even so, the attorneys for the parties represented to the court that Jason wanted to return home to his father while Tara did not. Tara's and Jason's CASA, James Cain, testified that Jason wanted to return to Father while Tara did not.

After the parties presented final arguments, the trial court announced that it was finding that Father had knowingly placed or allowed Tara and Jason to remain in conditions that endangered their well-being and engaged in conduct or knowingly placed Tara and Jason with persons who engaged in conduct that endangered their

11

well-being.[6] The trial court also announced that it was terminating Father's parental rights and that terminating his rights would be in Tara's and Jason's best interest.[7] On October 31, 2019, the trial court signed an *Order of Termination* consistent with the statements the court made on the last day of the trial.

Standard of Review-Continuances and Extensions

A ruling by a trial court to grant or deny a motion to continue and to grant or deny a motion to extend the statutory try or dismiss deadline are reviewable for abuse of discretion.[8] Under the abuse of discretion standard, the court reviewing the ruling must uphold the trial court's ruling as long as the ruling was not arbitrary, unreasonable, or made without reference to the guiding rules and principles that apply based on the circumstances in the case.[9]

Under the Family Code, trial courts must start the trial of parental-rights termination cases "on the first Monday after the first anniversary of the date the court

---

[6] *See id*. § 161.001(b)(1)(D), (E).

[7] *See id*. § 161.001(b)(2).

[8] *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) (reviewing a trial court's order denying a motion for continuance for an abuse of discretion); *In re D.W.,* 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied) (reviewing a motion to extend the dismissal deadline under section 263.401 of the Family Code for an abuse of discretion); *see also* Tex. Fam. Code Ann. § 263.401(a) (requiring trial courts to start the trial on the first anniversary after the court sings a temporary order appointing the Department as a child's temporary managing conservator).

[9] *See In re A.L.M.-F*., 593 S.W.3d 271, 282 (Tex. 2019).

rendered a temporary order appointing the [D]epartment as temporary managing conservator[.]"[10] Here, the trial court rendered the temporary order naming the Department as Tara's and Jason's temporary managing conservator on September 5, 2018. Thus, based on section 263.401(a) of the Family Code, the trial court had to start the trial no later than September 9, 2019, to prevent the case from being automatically dismissed.[11]

Given the problems created when Father's attorney failed to discharge the duties that he owed to Father as his attorney by appearing with him for the trial, the trial court continued the case from two trial settings, one on August 7 and the second on August 28. In part, Father complains the trial court did not extend the case past the September 9 try or dismiss deadline. To be sure, the Family Code provides trial courts with some discretion to extend try or dismiss deadlines in parental termination cases for up to 180 days. But courts may do so only if (1) extraordinary circumstances necessitate the Department remaining as temporary managing conservators of the children whose rights are involved in the suit and (2) the circumstances show that continuing the conservatorship beyond the try or dismiss deadline by no more than 180 more days is in the children's best interest.[12]

---

[10] Tex. Fam. Code Ann. § 263.401(a).
[11] *Id*.
[12] *Id*.

## August 7 Continuance

In issue one, Father argues that because none of the parties asked to continue the case or filed written motions for continuance, the trial court acted without authority by resetting the trial from August 7 to August 28. Yet this argument lacks merit. Under Texas law, trial courts have wide discretion to manage the needs of their respective dockets, so they have the right to schedule trials in a manner allowing the cases to be disposed of expeditiously.[13] Under the Texas Rules of Civil Procedure, trial courts are authorized to create deadlines to control the various phases of the cases on their dockets.[14] Even when trial courts sign pretrial orders scheduling deadlines, they may then modify the deadlines "to prevent manifest injustice."[15] Thus, the Rules of Civil Procedure recognize that trial courts have some rights to change or modify their interlocutory orders until they lose the authority they have over their final judgments.[16]

At the August 7 hearing, the Department informed the trial court that Father needed more time to obtain his new residence to allow the Department more time to decide whether to return Tara and Jason to Father's care. Thus, when the trial court

---

[13] *Clanton v. Clark*, 639 S.W.2d 929, 931 (Tex. 1982).

[14] Tex. R. Civ. P. 166.

[15] *Id.*

[16] *In re Estate of Henry*, 250 S.W.3d 518, 526 (Tex. App.—Dallas 2008, no pet.).

continued the case from its former setting on August 7, the court exercised its inherent discretion to manage its docket.[17] The continuance also gave Father more time to address the problems he was having with the attorney he had retained to represent him in the case. We conclude Father has not shown that the trial court abused its discretion by continuing the case from the setting of August 7 because the court's decision was reasonable under the circumstances based on the needs of the parties in the case.[18] We overrule Father's first issue.

Denial of Father's Motion to Continue the
September 9 Setting

In issue two, Father argues the trial court abused its discretion by refusing to continue the case from its September 9 setting. According to Father, he needed a continuance from the September 9 setting so the attorney he hired in September could have the time he needed to prepare for trial. Given that Father decided to retain another attorney following the August 28 hearing, we assume that Father decided to change counsel after he learned that the Department was formally changing its stated goal from reunifying the family to terminating his rights. In addition to needing more time for his newly retained attorney to prepare for trial, Father argues the trial court

---

[17] *See Clanton*, 639 S.W.2d at 931.
[18] *Jackson v. Jackson*, 556 S.W.3d 461, 471 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

erred by failing to give him the "warning to parents," as required by section 263.006 of the Family Code.[19] Stated another way, Father suggests that he would have obtained another attorney sooner had the trial court given him the warning required by section 263.006.

The parties do not dispute that the try or dismiss deadline that applies to Father's case is September 9, 2019, unless "extraordinary circumstances" existed that required extending the case beyond that deadline.[20] Father suggests the Department's change in goals as of August 28 coupled with the fact he had to replace his attorney of record required the trial court to find the circumstances sufficient to justify extending the deadline that applied to the Department's suit. While the record certainly shows there are delays associated with Father's original attorney of record, the trial court appears to have blamed Father for them, given Father's knowledge that his attorney was not attending court with him by at least January 2019. Generally, when it comes to delaying a trial, courts will not infer that an "extraordinary circumstance" exists when the fault for the circumstance leading to

---

[19] *See* Tex. Fam. Code Ann. § 263.006 (requiring, in cases in which the Department takes a child into temporary custody, the trial court to "inform each parent in open court that parental and custodial rights and duties may be subject to restriction or to termination unless the parent or parents are willing and able to provide the child with a safe environment").

[20] *Id.* § 263.401(b).

the delay lies with the party responsible for causing the delay.[21] On this record, we cannot say the trial court abused its discretion by finding Father at fault for the delays given that Father knew as early as January 2019 that his attorney of record was not discharging the duties he owed Father as his attorney of record in the suit. Moreover, by recessing the case after the Department called its first witness, the trial court allowed Father's attorney more than thirty additional days to prepare Father's defense.

Father's argument suggesting the judgment in the trial should be reversed because the trial court should have blamed the Department for the delays associated with the decision it announced on August 28 to change its stated goal to termination is also without merit. The record the Department's petition alleged that the Department was seeking a judgment terminating Father's parental rights. The court drove the risk home to Father during the October 2019 hearing, warning Father that "[i]f you are unwilling or unable to demonstrate an ability to provide [Tara and Jason] with a safe, stable environment, it is possible -- in this case highly likely -- that your parental rights will be permanently restricted or terminated." The temporary order has a similar warning, as the order states in bold print:

> **THE COURT FINDS AND HEREBY NOTIFIES [FATHER] THAT EACH OF THE ACTIONS REQUIRED OF [HIM]**

---

[21] *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied).

17

**BELOW ARE NECESSARY TO OBTAIN THE RETURN OF THE CHILDREN, AND FAILURE TO FULLY COMPLY WITH THESE ORDERS MAY RESULT IN THE RESTRICTION OR TERMINATION OF PARENTAL RIGHTS.**

Father's signature appears on the temporary order, so he was on notice that his rights as a parent were at risk. The family services plan, which Father signed in October 2019, contains a similar warning, which states: "IF YOU ARE UNWILLING OR UNABLE TO PROVIDE YOUR CHILD WITH A SAFE ENVIRONMENT, YOUR PARENTAL AND CUSTODIAL DUTIES AND RIGHTS MAY BE RESTRICTED OR TERMINATED OR YOUR CHILD MAY NOT BE RETURNED TO YOU."

Father's argument suggesting he never received the warning to parents required under section 263.006 of the Texas Family Code is unsupported by the record.[22] We conclude Father has not shown the trial court abused its discretion by denying his motion to continue the September 9 trial setting. We overrule Father's second issue.

Best-Interest Findings

In Father's third issue, he argues the evidence admitted during the trial is insufficient to show that terminating his parental rights is in Tara's and Jason's best

---

[22] Tex. Fam. Code Ann. § 263.006.

interest. "In determining whether the evidence is legally sufficient to support a best-interest finding, we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence, and ignore evidence a fact-finder could reasonably disbelieve."[23] Under the Family Code, a "rebuttable presumption [exists] that the appointment of the parents of a child as joint managing conservators" will serve the child's best interest.[24] That said, there is also a rebuttable presumption that a prompt and permanent placement of a child in a safe environment is in the child's best interest.[25]

In reviewing a trial court's best-interest findings, we apply the nine factors described in *Holley v. Adams* when measuring whether the evidence supports the trial court's best-interest findings.[26] Of note, the *Holley* factors are not exclusive, so

---

[23] *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (cleaned up).

[24] Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parents).

[25] Tex. Fam. Code Ann. § 263.307(a).

[26] In *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976), the Texas Supreme Court applied these factors in its review:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the parties seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;

other factors can be considered in deciding whether the evidence supports the trial court's best-interest finding.[27] In parental termination cases, the evidence need not include evidence on each of the *Holley* factors, particularly when "the evidence [is] undisputed that the parental relationship endangered the safety of the child."[28]

In his appeal, Father has not challenged the trial court's finding that he engaged in conduct that endangered Tara's and Jason's well-being. While the evidence in the record does not address all nine *Holley* factors, the evidence does address several of them. In reviewing findings in parental termination cases, trial courts, when acting as the factfinder in the case, have the right to weigh the relative evidence on each factor differently on some factors than they weigh evidence on others.[29] Thus, no single *Holley* factor is controlling in our review of an appeal that argues the evidence is insufficient to support a trial court's best-interest finding.[30] Moreover, sometimes evidence on just one of the factors may offer sufficient evidence to support the trial court's finding terminating a parent's rights.[31]

---

- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omissions.

[27] *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).
[28] *Id.*
[29] *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).
[30] *Id.*
[31] *Id.*

As in this case, evidence that a parent engaged in conduct that endangered a child is relevant to the review of the finding that terminating Father's parental rights is in Tara's and Jason's best interest.[32] The evidence addressing a child's best interest may be direct or circumstantial, and may include subjective factors such as the factfinder's observations of the parents in court.[33] Often, evidence describing a parent's past conduct may have been highly relevant to the trial court's finding that terminating the parent's rights is in the child's best interest.[34] When we review the evidence the trial court considered, we examine it from the standpoint of the child, not from that of the child's parent.[35]

Here, the testimony established that Father has a long history—nearly twenty years—showing that he abuses alcohol. The choices Father made to drink and drive ultimately caused instability in Tara's and Jason's home, as the evidence shows they were cared for by a relative or placed in foster care on multiple occasions. In his brief, Father acknowledges that he has not provided his children with "stability due to his incarceration[s] which were the result of his drinking alcohol and driving." At

---

[32] *See In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

[33] *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

[34] *Id.*

[35] *See In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (citing *In re S.A.P.*, 169 S.W.3d 685, 707 (Tex. App.—Waco 2005, no pet.)).

trial, Father asked the trial court to discount the history of instability he created in the home, suggesting he has now turned the corner on recovering from his dependence on alcohol. According to Father, if given just one more chance, he will provide his children a safe and stable home. Father points to the evidence showing that he and Jason have a strong bond, and he suggests that the trial court should have deferred to Jason's stated desire to return home in deciding whether terminating his rights would actually serve the best interests of his children.

We readily agree the record contains evidence that, if the trial court had found it believable, offers support for Father's argument he has finally turned the corner on recovering from his dependence on alcohol. For instance, there is evidence in the trial showing that Father completed the requirements of his family service plan, a plan that included a program requiring Father to obtain treatment for his abuse of alcohol. Father has also not tested positive on any of the tests he took to detect alcohol or drugs, he completed a drug and alcohol assessment, he has a sponsor from Alcoholics Anonymous, and he has completed a plan that is designed to reduce his risk of having a relapse. Father also notes he is currently on probation after pleading guilty of a fifth DWI, suggesting he would not risk violating the terms of his probation and risk going back to jail. The probation order on the fifth DWI requires that Father attend DWI court and an outpatient treatment program. Father points to

the evidence showing he has worked consistently for the same employer since he returned to Texas after completing the requirements of probation on his fourth DWI. The evidence shows that he earns a sufficient income from his job to allow him to provide for what his children would need. Finally, Father points to the evidence in the trial showing that he is currently living in a three-bedroom apartment, space that would allow Tara and Jason to have their own bedrooms.[36]

But there is also evidence showing Father has a long history of alcohol abuse, evidence that allowed the trial court to form a firm belief or conviction that Father would return to his old patters of drinking, which would then lead to further instability in Tara's and Jason's lives. Boiling it down, Father asks this Court to weigh the evidence differently from the way the trial court weighed it. But that's not this court's role, given the trial court's sole right to decide how much weight to give the testimony adduced on the various *Holley* factors during a trial.[37] Thus, while Father promises he will not return to his historical pattern, the trial court could reasonably have chosen to disagree given Father's historical inability over the past two decades to control his need for alcohol.[38] On this record, we cannot say the trial

---

[36] The testimony in the trial shows that Father had water service to the apartment where he was living when the case was tried.

[37] *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-20 (Tex. 2005).

[38] *See* Tex. Fam. Code Ann. § 263.307(a).

court abused its discretion by rejecting the evidence Father relied on to claim he has now turned the corner on his abuse of alcohol so that he can avoid returning to the patterns that resulted in his children being taken by the Department and placed in foster care.

There is also other evidence in the record relevant to some of the other *Holley* factors that offers additional support for the trial court's best-interest finding. For instance, Tara's and Jason's foster parents testified in the trial. They testified they love the children and that both children are thriving in their care. The evidence allowed the trial court to conclude that the children's foster parents have provided and can continue providing Tara and Jason a safe and stable home along with providing for their needs. Additionally, Tara's and Jason's foster parents testified they wanted to adopt them, so the trial court could have viewed the termination of Father's rights as the first step in a plan that would lead to the siblings being able to stay together. The foster parents also testified that if they were successful in adopting the children, they would still allow Tara and Jason to maintain a relationship with their father.

During the trial, Rosalind McCray (the caseworker the Department assigned to the case) addressed the Department's desire to place Tara and Jason in a safe, stable, and permanent home. According to McCray, the Department's initial goal

24

was to reunify the children with their Father, but the Department's goal changed when McCray learned Father had filed a credit application for water service and misrepresented who was leasing the apartment so that a service provider would connect the apartment so that it could be serviced with water. McCray learned that Father falsified the application because he had skipped out on his obligation to pay another water bill.

The Department also presented evidence challenging Father's truthfulness about whether he was complying with the treatment goals required by the Department's family service plan. On cross-examination, Father admitted he sent a text message to Andy Garcia, his employer, stating that he would "do everything else [the Department] ask[s]. My lawyer said fake the AA to be able to work. So that's what I was doing. Now they want actual sign-in sheets. So I have no choice but to fake them." In her testimony, McCray testified that Father had not been honest with her "on things that have been going on."

To be fair, there is testimony in the trial the court could have, in its discretion, chosen to weigh differently. James Cain (the CASA) testified he did not believe that terminating Father's parental rights was in Jason's best interest. According to Cain, Father has done an "amazing" job turning his life around and can now provide for his children's needs. Cain explained that while Tara told him she wanted to remain

25

with her foster parents, Jason and Father have a strong bond and he told Cain that he wants to return to Father's care. Cain concluded that, in his opinion, terminating Father's parental rights is in Tara's best interest but not in Jason's. When the trial court asked the attorney ad litem to express an opinion, she urged the trial court to name the Department as Tara's sole managing conservator and allow Jason to return home to Father.

We acknowledge the record contains conflicting evidence about the factors relevant to the trial court's best-interest finding. Even so, it was up to the trial court, as the trier of fact, to weigh the evidence and decide what, in the future, would serve each child's best interest. Based on the evidence, we conclude the trial court did not abuse it discretion by finding the Department's plan superior to the plans for the children proposed by others in the case.[39] The testimony in the trial suggests it could harm Tara and Jason should they be separated. Thus, the trial court could not have granted the preferred outcome in the case that each child expressed to the CASA. And the trial court had the right to weigh the need for a prompt, permanent and safe placement over Jason's expressed preference asking that the court return him to his Father's care.[40]

---

[39] *See City of Keller*, 168 S.W.3d at 819.
[40] *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Given that the trial court's role as the factfinder in the trial together with its right to weigh the evidence, we hold the record contains sufficient evidence to support the trial court's best-interest findings.[41] On this record, we cannot say the trial court abused its discretion by striking the balance in favor of its apparent view that the children needed a resolution that promoted stability, safety, and permanence in their lives. We hold the record contains sufficient evidence to allow the trial court, as the trier of fact, to form a reasonably firm belief or conviction that terminating Father's parental rights is in each child's best interest.

We overrule Father's third issue.

## Ineffective Assistance of Counsel

In issue four, Father complains his trial counsel and the attorney the trial court appointed to serve as the children's attorney ad litem provided ineffective assistance by failing to call Tara and Jason to testify during the trial. Before discussing the specifics of Father's argument, we briefly note the standard that applies to our review of issue four. In parental termination cases, Texas courts follow the test established in *Strickland* to measure a parent's allegations claiming the parent received constitutionally ineffective assistance of counsel.[42] To prove an ineffective

---

[41] *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[42] *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).

assistance claim, the party asserting the claim must establish that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.[43] Under *Strickland*, the parent must "successfully show both prongs of the inquiry."[44] The parent who is claiming ineffective assistance has the burden of proof on the claim.[45]

In considering a claim of ineffective assistance of counsel, we "must take into account all of the circumstances surrounding the case, focusing on whether counsel performed in a 'reasonably effective' manner."[46] Our review of counsel's performance is highly deferential, and we presume that counsel's conduct fell within the range of reasonable professional assistance, considering "the possibility that counsel's actions [were] strategic."[47] "An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."[48] Since strategy plays a large role when deciding whether to call a witness to testify in a trial, decisions in trials over whether to call a witness

---

[43] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005).

[44] *See Strickland*, 466 U.S. at 688, 694; *M.S.*, 115 S.W.3d at 545.

[45] *M.S.*, 115 S.W.3d at 545.

[46] *Id.* (citing *Strickland*, 466 U.S. at 687).

[47] *Id.*

[48] *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 622-23 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (cleaned up).

to testify in the trial are not usually sufficient to prove a claim of ineffective assistance of counsel unless the parent establishes that the failure to call the witness was "so outrageous that no competent attorney would have engaged in it[.]"[49]

That said, *Strickland* and the family law cases we have cited addressing claims of ineffective assistance of counsel do not involve a complaint by the defendant against an attorney that did not have an attorney-client relationship with the defendant in the case.[50] Father cites no cases supporting his argument that he may complain about ineffective assistance of counsel when the complaint concerns the conduct of an attorney, in this case the attorney ad litem, with whom he did not have an attorney-client relationship in the case.

To decide whether Father can assert a claim for ineffective assistance against someone who was not his lawyer, we must decide whether Father enjoys standing to complain about the conduct of someone who was not his lawyer. Without standing, the court has no case or controversy to decide. Under Texas law, to establish standing, the "plaintiff must allege 'a concrete injury . . . and real controversy

---

[49] *M.S.*, 115 S.W.3d at 545 (cleaned up).

[50] *See Strickland*, 466 U.S. at 671 (complaint by defendant in a criminal case against the attorney appointed to represent him in the trial); *J.P.B*, 180 S.W.3d at 574 (complaint by Mother levelled at Mother's trial counsel); *M.S.*, 115 S.W.3d at 545 (complaints by Mother levelled at Mother's trial counsel).

29

between the parties that will be resolved by the court.'"[51] The injury must be threatened or actual, not one that is merely hypothetical.[52]

Here, Father failed to prove that he had an attorney-client relationship with the attorney ad litem. Thus, Father does not have standing to challenge the choices the attorney ad litem made as to the strategy she followed when she discharged the duties required based on her appointment to serve as the attorney ad litem for the children in the trial.

As for Father's complaint about the attorney he hired to represent him, the Department argues we should not reach Father's argument asserting his attorney was ineffective because the Texas Supreme Court has not yet recognized whether a parent, who retains an attorney rather than has an attorney appointed for him by the court, has a claim for constitutionally ineffective assistance of counsel based on the strategic decisions the attorney made in the trial. But the intermediate courts of appeals are split on this question. One of our sister courts has recognized that such

---

[51] *Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020) (quoting *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154 (Tex. 2010)); *see also In re T.N.*, 142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no pet.).
[52] *Id.*

claims are cognizable while another intermediate court of appeals found they are not.[53]

While the dispute is an interesting legal question, we need not resolve it to resolve Father's appeal. Instead, we will assume (without deciding) that Father's complaints about the attorney who represented him in the trial are cognizable and review the record to determine whether Father met his burden to prove his attorney breached the duty he owed Father to provide him with constitutionally effective assistance in the trial.[54]

The record shows Father never filed a motion for new trial and his trial attorney did not file an affidavit or testify about why he did not call Tara and Jason as witnesses in the trial. Thus, the record is silent about why the attorney did not call either child to testify. When the record is silent about trial counsel's strategy, we cannot find that the choice the attorney made not to call a witness in the trial is a choice that no competent attorney would have made.[55]

---

[53] *See, e.g.*, *In re D.T.*, 593 S.W.3d 437, 439-40 (Tex. App.—Texarkana 2019, pet. granted) (concluding parents who retain counsel cannot raise an ineffective assistance challenge to the termination order, while citing cases from other courts of appeals that held the same); *but see In re E.R.W.*, 528 S.W.3d 251, 261 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (concluding the right to effective counsel extends to non-indigent parents who have retained counsel).

[54] *See Strickland*, 466 U.S. at 687.

[55] *Bone v. State*, 77 S.W.3d 828, 833-34 (Tex. Crim. App. 2002).

Assuming Father can raise an ineffective assistance of counsel claim against an attorney whom he retained, we conclude Father failed to meet his burden of proving the attorney failed to discharge his duty to provide constitutionally effective assistance of counsel.[56] We overrule Father's fourth issue.

## Conclusion

Having considered each of Father's arguments supporting his issues, we conclude that Father has not shown that reversible error occurred. For that reason, the trial court's *Order of Termination* is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on August 11, 2020
Opinion Delivered December 3, 2020

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[56] *Walker*, 312 S.W.3d at 622-23.